**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael A. S. MAKRIS, Defendant-
Appellant.**

**No. 72–2915.**

United States Court of Appeals,
Fifth Circuit.

Aug. 14, 1973.

Rehearing Denied Sept. 7, 1973.

David H. Berg, Houston, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Michael A. S. Makris was convicted in a non-jury trial on three counts of perjury in violation of 18 U.S.C. § 1621. On appeal Makris makes three primary contentions: (1) his sworn answers to questions propounded by an examiner for the Securities and Exchange Commission were not perjurious; (2) the evidence was insufficient to support the court's finding that he was sane at the time of the alleged offenses; and (3) he was improperly denied a hearing under 18 U.S.C. § 4244 to determine his competency to stand trial.

■ We find that the court below erred in denying Makris the full procedural rights mandated by 18 U.S.C. § 4244, and therefore remand for further proceedings in respect to the appellant's ability at the time of trial to participate in his own defense.[1] Regardless of the outcome of this required procedure, the remaining points raised ought to be reached now. If Makris was competent to stand trial, then such rulings end the cause. If he was not competent, the resolutions will guide any retrial that may be had.

### PERJURY

In December 1970 Makris appeared before officers of the Securities and Exchange Commission to testify concerning his connection with National Bankers Life Insurance Company and Ling & Company. Information available to the Commission indicated that Makris had been a promoter of securities transactions involving the two companies under investigation. The first transaction involved Frank Sharp, a Houston banker, real estate developer, and principal party in both the Sharpstown State Bank and the National Bankers Life Insurance Company. The indications were that in contacts with Sharp, Makris had offered to obtain access to a large fund of bonds and other blue-chip securities of major American corporations which were reportedly held by bankers in Switzerland. The alleged scheme entailed the purchase of the securities, worth up to $20,0,000,000, for as little as ten percent of their face value. The SEC also thought that Sharp and Makris had contacted members of the Jesuit Order for the purpose of obtaining "seed" money for the purchase of the securities. The second and less grandiose transaction involved the purchase of control in a small West Virginia oil company, Red Rock Petroleum, and the fraudulent inflation of the market value of its stock in order to finance the acquisition of a Houston-based food processing company and restaurant chain.

Makris was convicted on three counts of perjury in regard to his testimony before the SEC.[2] He now contends that as to each count the evidence was insufficient to establish the knowing falsity of his sworn responses required to sustain a conviction under 18 U.S.C. § 1621.[3]

■■ The basic element of the crime of perjury is that the challenged sworn testimony must be false. No one may be lawfully convicted of perjury where he gives an answer which is "literally accurate, technically responsive, or legal-

---

1. In regard to the appellant's additional contention, we find no abuse of discretion in the failure to disclose the presentence report. See United States v. Frontero, 452 F.2d 406, 411 (5th Cir. 1971).

2. Makris was sentenced to four years imprisonment on each of Counts I and II and to five years probation on Count III, all sentences to run consecutively.

3. "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. . . . ."

ly truthful." United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967); Smith v. United States, 169 F.2d 118, 121 (6th Cir. 1948). It is the obligation of the government to prove to a moral certainty that the defendant "purposefully misstated the fact knowing it to be false and untrue." Van Liew v. United States, 321 F.2d 674, 679 (5th Cir. 1963).

In Count I Makris was convicted on the basis of the following testimony concerning his business dealings with Frank Sharp:

Q. All right. In connection with— let's call it the securities aspect here—have you ever indicated to Mr. Sharp—we were talking about this trust fund, so to speak, of securities allegedly deposited by refugees of Nazi Germany— that you might be able to obtain an interest for him in this or to bring these securities to the United States for his benefit?

A. None at all.

Q. All right.

A. Not at all. Mr. Sharp, like I say, is a very quiet person.

Q. Yes.

A. I had no conversation with him about it.

Makris contends that the government failed to prove the falsity of his negative responses to the specific question propounded by the SEC interrogator. Precise testimony was adduced at the trial below showing that Makris had discussed with Frank Sharp a scheme to obtain an interest in securities Makris represented were deposited in European banks. However, the specific question which is the basis of Count I is whether Makris had promised to obtain an interest in, or to return to the United States, a particular group of securities, specifically characterized as ". . . this trust fund . . . of securities allegedly deposited by refugees of Nazi Germany. . . ." The immediately preceding portion of the transcript indicates that "this trust fund" refers to a group of securities ". . . deposited in Zurich, Switzerland." [4]

During his extensive trial testimony, Frank Sharp was asked at least twice whether Makris had ever identified the location of the fund of securities discussed. On each occasion Sharp stated that Makris had merely said that the securities were "on the Continent." Father Kennelly, who had been present on one occasion when Makris discussed the trust fund with Sharp, likewise testified that Makris described the securities as being "in Europe." Furthermore, Sharp testified that Makris characterized the beneficiaries or depositors of this trust fund not as refugees of Nazi Germany but as persons who lived "behind the Iron Curtain." The only other evidence bearing on whether Makris offered Sharp an interest in a Zurich-based trust deposited by refugees of Nazi Germany is the testimony of two agents, one a promoter and one a priest, whom Sharp directed to go to Switzerland to investigate the purported securities-trove. Jimmy Day, the promoter, testified that Sharp had directed him to go to Zurich to arrange for the purchase of stocks and bonds. Similarly, Father Alchediak testified that he had been instructed to travel to Geneva to assist Sharp and the Jesuit Order in obtaining securities which were held in Zurich. However, since neither Day nor Alchediak was able to testify directly to discussions between Makris and Sharp, their testimony is at best inferential evidence that Makris may have indicated to Sharp that the interest he was discussing was in a trust fund located in Zurich. Furthermore, neither Day nor Alchediak offered any evidence that Makris had discussed with Sharp a trust

4. The SEC examiner established his predicate for his question concerning "this trust fund" by stating: "We have information indicating there might have possibly been a trust fund accumulated by the refugees of Nazi Germany with bankers of Zurich, Switzerland."

"deposited by refugees of Nazi Germany." To the contrary, both testified that when they received their instructions from Sharp to travel to Switzerland, they had been told that the trust property belonged to Makris' family. To further wrap the riddle in mystery Day testified that he was approached in Zurich by a man identifying himself as a member of the Jewish underground who warned him to have nothing to do with the securities because they had been stolen from Jews by the Nazis and that these instruments belonged to the people of Israel.

At trial the government recognized the weakness of its proof of the specific falsity of the Count I testimony. The government contended, however, that it merely needed to show that the defendant intended to make a false and misleading answer to the substance of the question propounded, towit: whether he had offered Sharp an interest in any securities trust similar to the one described. This approach would, of course, eliminate the variance between the exact terms of the SEC interrogatory and proof of specific dealings between Makris and Sharp. *See* United States v. Laite, 418 F.2d 576 (5th Cir. 1969). *Laite* was the primary case relied upon by the court below. However, it is clearly distinguishable.

In *Laite* the defendant was convicted of perjury in a wage and hour proceeding for responding negatively to the question "Did you ever tell anybody that you would . . . let them work more than eight hours and just pay them straight time?" This court held it to be legally immaterial whether or not Laite had used the exact words "more than eight hours" since the jury could reasonably infer that Laite had intended a false answer to the substance of the question, towit: whether he had told the workers that they could work "overtime" for straight time pay. In the case *sub judice*, Makris was indicted for a negative response to a question which described a particular trust fund with specific characteristics of ownership and location. The proof not only failed to pinpoint the location of the trust which Makris offered to Sharp, but also, more importantly, it described a different group of persons—communist interns—as the beneficiaries.

■■ In argument to the court below, the government emphasized that the evidence strongly indicated that Makris had intended to deceive the Commission. The court obviously found this factor persuasive. In the interval between Makris' conviction and this appeal, the Supreme Court has unanimously rejected the suggestion that a defendant may be convicted for perjury solely on the basis of his deceptive intentions. In Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the defendant had given a sworn answer which was deliberately misleading but literally true. The court held that regardless of the defendant's intention to deceive or mislead the examiner, there could be no perjury so long as the witness spoke the literal truth. In the present case, while the proof was clear that Makris had offered to obtain for Sharp some securities in Europe, the government failed to prove beyond a reasonable doubt that Makris uttered a falsehood when he stated that he had never offered Sharp an interest in a trust fund of securities deposited in Zurich by refugees of Nazi Germany.

■ In contrast to the situation in Bronston, 409 U.S. at 355, 93 S.Ct. at 598, the literal truth of Makris' response is by no means certain. But, of course, Makris bears no burden to show that he spoke truthfully. Neither the trial court nor the prosecution had the benefit of *Bronston* when this case was tried. There well may have been some way to prove that the question as propounded was answered falsely. If such proof was available, it was not adduced. Knowing the test of *Laite* is inapplicable to the question involved here, the prosecutor may be able to develop the facts in a different fashion which will convince the trier of fact that Makris lied when he answered this question. The defi-

ciency in the proof in this record of the falsity of Makris' response to the question propounded requires reversal of his conviction on Count I, but since Makris moved for a new trial alleging the insufficiency of the evidence, a decision to retry is in province of the prosecution. Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950); Montoya v. United States, 402 F.2d 847 (5th Cir. 1968); Wright, Federal Practice and Procedure: Criminal § 470 (1969).

■ In regard to Counts II and III, there is no similar deficiency of proof of the willful falsity of Makris' sworn statements. Count II is based on the following testimony concerning Makris' connection with Father Kennelly of the Jesuit Order:

Q. All right. Now, concerning this alleged trust fund of securities, we have information indicating that it's alleged to have initially been an amount in excess of two hundred million dollars, and that there were arrangements made for the two hundred million dollars to be turned over to Catholic societies, principally Loyola University. Do you have any knowledge of that transaction?

A. No.

Q. Have you ever had any dealings with Father Kennelly? Do you know Father Kennelly?

A. Yes, I know him.

Q. I believe its spelled K-e-n-n-e-l-l-y.

A. Yes, my son was going to go to his school.

Q. All right. And have you ever discussed this particular thing, this trust fund, with Father Kennelly?

A. No.

Q. What have been your conversations with Father Kennelly?

A. School.

Q. Just social conversations?

A. Yes, social.

Q. They haven't involved any finances?

A. Absolutely not.

Assuming arguendo that the first question set out in Count II suffers from the same type of overspecificity which created a variance between indictment and proof in regard to Count I, in the following series of questions the SEC interrogator bore down until Makris stated that he had absolutely no conversations with Father Kennelly involving "any finances." The testimony of both Sharp and Kennelly shows beyond any reasonable doubt that Makris had conversations with Kennelly involving not only social pleasantries but also a plan for the Jesuits to finance the acquisition of European securities. To sustain a perjury conviction, the government need not show that all the testimony set out in a single count of the indictment is false. It is sufficient to prove falsity in regard to one or more material particulars. Stassi v. United States, 401 F.2d 259, 262 (5th Cir. 1968), vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Arena v. United States, 226 F.2d 227, 236 (9th Cir. 1955), cert. denied, 350 U.S. 954, 76 S. Ct. 342, 100 L.Ed. 830 (1956). The proof of the manifest falsity of Makris' assertion that he had absolutely no conversation with Father Kennelly involving finances is sufficient to sustain the conviction under Count II.

■ Count III alleged perjury in regard to the following testimony:

Q. All right. You are familiar with the name Bedrock Petroleum, is that correct?

A. No.

Q. Have you ever heard of it before?

A. No, I haven't.

Testimony of numerous witnesses demonstrated that Makris had personally negotiated the purchase of the controlling stock of Bed Rock Petroleum, had issued additional stock certificates in the name of that corporation, and had used Bed Rock securities to acquire control of Youngblood's Fine Foods, Inc. The evidence shows Makris' negative response

to the SEC questions regarding his knowledge of Bed Rock Petroleum to be false beyond a reasonable doubt. When these questions are viewed in context, the further contention that they are ambiguous (e. g. "Bed Rock Petroleum" might refer to a geological formation) is frivolous.

 Makris additionally asserts that the government failed to prove that his testimony which was the subject of Counts II and III was material as required for conviction under 18 U.S.C. § 1621. *See, e. g.* Beckanstin v. United States, 232 F.2d 1, 3–4 (5th Cir. 1956). We find this contention without merit. As this court recently pointed out in United States v. Gremillion, 464 F.2d 901, 904 (5th Cir. 1972):

> Under the perjury statute . . . the false statement must be material to the matter in issue. *See* Williams v. United States, 239 F.2d 748 (5th Cir. 1957). The statements need only be material, however, to any proper matter of inquiry—not just to the main issue. United States v. Culverhouse, 436 F.2d 1068 (5th Cir. 1971) . . . . The test of materiality is whether the false statement was capable of influencing the tribunal on the issue, Barnes v. United States [378 F.2d 646 (5th Cir. 1967), cert. denied, 390 U.S. 972, 88 S.Ct. 1056, 19 L.Ed. 2d 1184 (1968)], or whether the false testimony would have the natural effect or tendency to influence, impede, or dissuade [investigatory body] from pursuing its investigation. United States v. McFarland, 371 F.2d 701 (2d Cir. 1966), United States v. Marchisio, 344 F.2d 653 (2d Cir. 1965). The false statements need not actually impede the investigation. Vitello v. United States, 425 F.2d 416 (9th Cir. 1970).

At the time of Makris' SEC testimony, the Commission was involved in an investigation of corporations controlled by Frank Sharp. In particular the Commission had learned of an effort to bolster the financial status of National Bankers Life Insurance Company through the acquisition of securities purportedly held in trust in Switzerland. Information then available indicated that Makris and Sharp had offered a share in the trust fund to Father Kennelly and the Society of Jesus in return for the seed money necessary to obtain access to the securities. The Commission had an official interest in any conversations between Makris and Father Kennelly on financial topics which might be relevant to the investigation of National Bankers Life and related companies. There is no doubt that Makris' false response that he had had absolutely no conversations concerning financial matters with Father Kennelly had the natural tendency to "influence, impede, or dissuade" the SEC examiner from probing more deeply into his involvement with Sharp and Kennelly.

As pointed out above, Makris was summoned to testify before the SEC not only in connection with National Bankers Life but also in regard to the activities of Ling & Company, a Dallas brokerage house. In particular, the Commission was interested in the role of Ling & Company as a dealer in Bed Rock Petroleum stock at a market price of seven to ten dollars per share. Since there was evidence that Ling & Company had been involved in making an inflated market in Bed Rock Petroleum stock preparatory to the acquisition of control in Youngblood's through a stock transfer, Makris' knowledge of Bed Rock Petroleum and transactions in its securities were highly material to the SEC investigation of the trading activities of Ling & Company.

## INSANITY AND COMPETENCY TO STAND TRIAL

In April 1970, approximately eight months prior to his testimony before the SEC and over two years before the trial in the court below, Makris underwent brain surgery for the removal of a pituitary adenoma. Because of the size of the tumor and the location of the pituitary gland, the operation entailed exten-

sive manipulation of the frontal lobes of the brain as well as destruction of the pituitary gland itself. Expert testimony indicates that this type of radical surgery will affect in varying degree the behavior, personality, and mental condition of the subject.

Prior to trial, the court on the government's motion appointed a highly qualified psychiatrist, Dr. Alfred Vogt, to examine Makris and report to the court on his competency to understand the proceedings against him and to properly assist in his own defense. The report made as a result of the order deals extensively with the appellant's condition not only at the time of trial but also at the time of the alleged perjury. Dr. Vogt's findings are the basis for the Makris' arguments concerning both insanity at the time of the offense and competency to stand trial.

(1) *Insanity at the time of the offense.* Dr. Vogt's report concluded that Makris at all times after the operation had the capacity to know right from wrong. However, it was his opinion that, as a result of a brain injury syndrome resulting from the tumor and consequent surgery, Makris was unable to control his conduct under stress. Although he was initially appointed by the court on the government's motion, Dr. Vogt supplied the most cogent proof for the defense on its pretrial motion to suppress evidence of Makris' testimony before the SEC. In effect, the hearing on this motion became a plenary hearing on Makris' sanity at the time of the alleged perjury.[5]

In oral testimony Dr. Vogt amplified the opinion expressed in his written report that Makris suffered from an aberrant capacity to deal with stressful situations. The doctor explained that, while in non-stress circumstances Makris would appear normal and respond rationally, a situation which his mind perceived as threatening danger might reduce Makris to a panic state in which his cognition of external stimuli would be reduced and his responses would become random, unpredictable, and not subject to control by his ego function. Dr. Vogt opined that the SEC hearing must have been just such a stressful experience and that under such circumstances he would expect that Makris had been incapable of comprehending the questions propounded. Further, in response to the questions framed in the language of this court's test of legal insanity,[6] Dr. Vogt stated his belief that Makris had lacked the capacity to appreciate the legal consequences of false answers made during the hearing and was then mentally incapable of conforming his testimony to the standard of veracity required by the law. Dr. Vogt also emphasized that in non-stress circumstances Makris had both the mental ability to conform his conduct to the requirements of the law and the mental capacity to formulate a culpable intent to lie.

---

5. The motion to suppress alleged that Makris was legally insane and therefore unable to waive his right to counsel before the SEC. At the conclusion of the hearing on this motion, the court found, citing the prevailing legal standard for the defining of insanity, Blake v. United States, 407 F.2d 908 (5th Cir. 1968) (en banc), that Makris had the mental competency to validly waive counsel at the SEC hearing. The denial of the motion to suppress is not asserted as a ground of appeal.

6. This circuit's en banc definition of insanity is as follows:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

Blake v. United States, *supra*, 407 F.2d at 916. On the problems and propriety of permitting psychiatric experts to testify in the language of the legal test of insanity, see Goldstein, The Insanity Defense, 98–105 (1967).

■ The government called no expert witnesses to contradict Dr. Vogt's testimony. Instead the prosecution relied on testimony of lay witnesses, including the SEC examiner who observed Makris during the hearing and business associates who had dealt with the appellant after the operation and at about the time of the SEC hearing. On appeal, Makris argues that the trial judge committed error in disbelieving the expert testimony of Dr. Vogt in order to find Makris sane at the time of the offense. Upon a review of the record as a whole, we disagree.

■ Expert testimony bearing on sanity is not binding on the court; like other forms of expert testimony it may be rebutted by contrary evidence. Mims v. United States, 375 F.2d 135 (5th Cir. 1967); Breland v. United States, 372 F. 2d 629 (5th Cir. 1967); see also United States v. Alvarez, 458 F.2d 1343 (5th Cir. 1972); United States v. Harper, 450 F.2d 1032 (5th Cir. 1971); United States v. Pitts, 428 F.2d 534 (5th Cir.), cert. denied, 400 U.S. 910, 91 S.Ct. 154, 27 L.Ed.2d 149 (1970); Cf. United States v. Collier, 453 F.2d 1173 (5th Cir. 1972); Nagell v. United States, 392 F. 2d 934 (5th Cir. 1968); Brock v. United States, 387 F.2d 254 (5th Cir. 1967). Mims outlines some of the circumstances under which the government may meet its burden of proving sanity despite contrary expert testimony. 375 F.2d at 144–145. It is clear that the probative force of expert testimony is lessened when it is based on observations of the defendant at a time remote from the offense. The weight of expert opinion may be further reduced when the observed conduct of the defendant at the time of the offense does not correspond to that which is anticipated from an individual suffering from the type of defect diagnosed by the expert.

In the present case the opinion of Dr. Vogt was based on observations made more than 16 months after the SEC hearing. The government's lay testimony covered periods much closer to the time of the offense. Business associates testified that Makris had functioned responsibly and predictably while engaged in complex financial transactions. Makris argues that to a mind such as his, which was accustomed to dealing in high finance, the transactions described were not sufficiently stressful to trigger the reaction predicted by Dr. Vogt. However, the government also produced two lay witnesses, one—an attorney who visited Makris on the night before his SEC testimony—who observed the appellant during the period when he was subject to the immediate pressure of his impending appearance and another—the SEC attorney who conducted the interrogation from which the perjury charges arose—who observed Makris precisely at the moment of the offense. Neither of these individuals observed the random, unpredictable behavior which according to Dr. Vogt's diagnosis should have emerged when Makris was placed in what the psychiatrist thought would be a stressful circumstance. The examiner testified that Makris did appear to be tense during his testimony, but no more so than he had found to be normal among witnesses.

An examination of the entirety of the record of Makris' testimony at the SEC hearing fails to bear out the psychiatrist's hypothesis that Makris was in panic at the time of the offense. This transcript clearly confirms the testimony of the examiner that with the exception of a failure to remember certain names, Makris was uniformly responsive to the questions propounded. While evidence presented at trial showed that certain answers were factually false, there is simply no basis upon which it can be concluded that Makris failed to comprehend the questions or that his responses were random or unpredictable.[7] Con-

---

7. Under cross-examination, Dr. Vogt indicated that, on the basis of his diagnosis, he would have expected Makris to have committed more mistakes and prevarica-tions in his testimony than were indicated by the transcript of the SEC hearing.

trary to Vogt's hypothesis that Makris was in a state of stress during his SEC testimony, the transcript shows that he maintained an engaging sense of humor during the proceedings and retained the presence of mind to request the assistance of an attorney when he felt a need for legal counsel.

Thus the evidence concerning Makris' actual conduct fails to bear out Dr. Vogt's hypothesis that Makris' false testimony to the SEC was produced by a mental impairment. The court was well justified in concluding that either Dr. Vogt's diagnosis of a brain injury syndrome was wrong or alternatively, if the diagnosis was correct, that the SEC hearing was not such a stressful situation as to trigger uncontrollable prevarication or other irresponsible behavior.

(2) *Competency to Stand Trial:* 18 U.S.C. § 4244 provides for the appointment of a qualified psychiatrist to examine a person charged with a federal offense where there is reasonable cause to believe that the accused "may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense." *See generally,* United States v. McEachern, 465 F.2d 833 (5th Cir. 1972). Section 4244 further provides: "If the report of the psychiatrist indicates a state of present insanity or such mental incompetency of the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto."

The report of Dr. Vogt made as a result of his appointment under § 4244 has been discussed above. In the conclusion of his report, Dr. Vogt stated:

In reviewing the order for examination I would have to say the patient is not insane, but I do believe he has a type of incompetency [under stressful circumstances]. I believe he is capable to understand the proceedings against him, but I am not too sure how well he can participate in dealing with counsel for the purpose of participating in his own defense.

The trial judge found that this report did not indicate a state of present insanity or mental incompetency as described in § 4244 and, therefore, deemed a hearing unnecessary. We can not agree. The excerpt from the psychiatrist's report quoted above expressed the opinion that Makris had a type of incompetency which might affect his ability to stand trial; it put forward a well-documented doubt whether he was capable of participating in his own defense. This opinion is consistent with other aspects of the report which suggested that under stressful circumstances, which undoubtedly would include a criminal prosecution, Makris might behave irrationally or inconsistently in an attempt to avoid unpleasant consequences. Since the report as a whole indicated a substantial possibility that the defendant was then incapable "properly to assist in his own defense, . . ." under the mandatory provisions of § 4244 the court should have held a hearing specifically on the issue of the ability of the defendant to assist his counsel prior to beginning of trial.

The failure to conduct such a hearing does not, however, necessarily mandate reversal of Makris' conviction. Only if the appellant was, in fact, incompetent at the time of trial could a failure to hold the hearing required by 18 U.S.C. § 4244 be an error which affected his substantive rights. Gunther v. United States, 94 U.S.App.D.C. 243, 215 F.2d 493, 497 (1954). Here the psychiatrist's report, coupled with sworn testimony of defense counsel that the defendant had hindered their efforts by his inconsistent and unresponsible behavior, indicated that the defendant may have been incapable of effectively participating in his own defense. But these indications are by no means conclusive on that issue. The description of Makris' conduct by his trial counsel is equally consistent with the behavior of a fully-rational and self-controlled individual

who was attempting to make useful suggestions to his attorneys.

■ In this judge-tried cause it borders on the anomolous to remand for a hearing especially in view of the lengthy suppression hearing which delved so deeply in Makris' sanity and his competency to understand the warnings given to him at the time of the SEC proceedings. However, because of the lack of a hearing and specific findings on the mental condition of appellant on the date of trial, we are unable to make an adequate review of the decision by the district court to proceed with the appellant's trial. Section 4244 commands that we remand for further proceedings on this issue. See United States v. McEachern, supra; United States v. Roca-Alvarez, 451 F.2d 843, 848 (5th Cir. 1971); Whalen v. United States, 367 F.2d 468, 470 (5th Cir. 1966); Lewellyng v. United States, 320 F.2d 104, 106 (5th Cir. 1963).[8]

On remand it will first be the duty of the district court to determine whether it can conduct an adequate and meaningful hearing for the purpose of determining nunc pro tunc Makris' competency to stand trial in June 1972. United States v. McEachern, supra, 465 F.2d at 839–840 (5th Cir. 1972); Lee v. Alabama, 386 F.2d 97, 108 (5th Cir. 1967) (en banc), on remand, 291 F.Supp. 921, 926–927 (M.D.Ala.1967), aff'd, 406 F.2d 466 (5th Cir.), cert. denied, 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246

(1969). Despite the intrinsic problems of such a retrospective determination, see Dusky v. United States, 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed. 824 (1960); Pate v. Robinson, 383 U.S. 375, 387, 86 S.Ct. 836, 843, 15 L.Ed.2d 815 (1966), in the present case the possibility of an adequate hearing at this time is greatly enhanced by the fact that the trial court will have the benefit of testimony from the court-appointed physician who examined the defendant shortly before trial as well as its own personal observation of the appellant during trial. See, e. g., United States v. Lewellyng, supra, on remand, 229 F.Supp. 458 (N.D.Tex.1963). These observations may, of course, be supplemented by such additional evidence as the prosecution and defense develops during the Section 4244 hearing.

■ If the district court concludes that it can not conduct a meaningful hearing to determine competency nunc pro tunc, or, if, after hearing is held, Makris is found to have been incompetent at the time of his trial, the court must grant him a new trial at such time he may be found to be competent. If the hearing confirms the court's original determination of competency, Makris' conviction on Counts II and III shall stand affirmed but the court shall document its determination of competency by specific findings.[9]

Reversed, in part, and remanded.

---

8. This court has consistently rejected the rule followed in the Ninth Circuit where a successful appeal from failure to comply the procedures set out in 18 U.S.C. § 4244 results in the vacation of judgment rather than remand for additional proceedings with respect to the appellant's condition at the time of trial. United States v. Irvin, 450 F.2d 968 (9th Cir. 1971); Morris v. United States, 414 F.2d 258 (9th Cir. 1969); Meador v. United States, 332 F.2d 935 (9th Cir. 1964); also see Holloway v. United States, 119 U.S.App.D.C. 396, 343 F.2d 265, 267 (1964); but see United States

v. Taylor, 437 F.2d 371, 379 (4th Cir. 1971).

9. On appeal, Makris argues that the court should have made specific inquiry into the voluntariness of his waiver of jury trial. This issue is closely tied to the larger question of his competency to stand trial and participate in his own defense. If on remand Makris is found to have been competent to stand trial, we hold that he is bound by his written waiver of jury trial. If he is found to have been incompetent to stand trial, the waiver will not be binding at such time as he may be retried.