[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 04-14641

————————————————

D. C. Docket No. 00-00677-CR-KAM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 10, 2006
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAVIER IZQUIERDO,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

**(May 10, 2006)**

Before TJOFLAT and HULL, Circuit Judges, and RESTANI[*], Judge.

PER CURIAM:

 Defendant-Appellant Javier Izquierdo ("Izquierdo") appeals his cocaine

---

[*]The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade,
sitting by designation.

distribution and firearm convictions that were based on his guilty plea. Izquierdo

contends that the district court erred in denying his subsequent motion to withdraw

his guilty plea based on incompetency. After review and oral argument, we affirm

the denial of Izquierdo's motion and his convictions.

## I.    Background

### A.    Plea colloquy

Izquierdo, the sole appellant here, and his brother, Juan Izquierdo ("Juan"),

were indicted for robbery, in violation of 18 U.S.C. § 1951 (Count I); conspiracy to

distribute cocaine, in violation of 21 U.S.C. § 841 (Count II); use of a firearm

during a drug trafficking crime and during a crime of violence, in violation of 18

U.S.C. § 924 (Count III); and, as to Izquierdo only, possession of a firearm as a

convicted felon, in violation of 18 U.S.C. § 922 (Count IV). On September 10,

2001, pursuant to a written plea agreement, Izquierdo pleaded guilty to Counts II

and III of the indictment.[1]

During Izquierdo's plea colloquy, his attorney explained to the district court

that Izquierdo was illiterate and that his plea agreement had been previously read

aloud—verbatim—to Izquierdo by both his attorney and his brother Juan. Upon

questioning by the district court, Izquierdo stated, <u>inter alia</u>, that he had never been

---

[1]The plea agreement provided that the government would seek dismissal of Counts I and IV of the indictment in exchange for Izquierdo's guilty plea, which it did.

treated for a mental illness; that he was not presently under the influence of any drugs, alcohol, or medication; that he was satisfied with his attorney's representation; that he had a full opportunity to review the charges against him with his attorney; that he agreed with the alleged facts as described by the government; and that he understood "each and every term of the plea agreement," including his sentencing possibilities, that he was surrendering certain civil and trial rights, and that he might incur a fine or suffer adverse immigration consequences. Additionally, Izquierdo twice acknowledged that he was thinking clearly.

Based on the plea colloquy, the district court found Izquierdo "fully competent and capable of entering an informed plea," and accepted his guilty plea. The district court scheduled sentencing for December 11, 2001.

## B. Juan's trial and the Haber Report

In the interim, brother Juan's trial commenced on November 14, 2001. During that trial, Juan filed an ex parte motion to have Izquierdo declared incompetent. Juan's motion argued that he could not have participated in a conspiracy with Izquierdo because Izquierdo was of unsound mind. In support of his ex parte motion, Juan filed a report of a psychological evaluation of Izquierdo by Merry Haber, Ph. D., a psychologist (the "Haber Report"). Juan's counsel

3

retained Haber to evaluate Izquierdo, which she did on November 21, 2001. The Haber Report concluded that Izquierdo was incompetent.

In her Report, Haber summarized her evaluation of Izquierdo. Haber administered a mental status examination, a clinical interview, a standardized intelligence test, a test of reading, spelling, and arithmetic achievement, and a measure of visual-motor coordination, perceptual organization, and memory.[2] Haber also consulted Izquierdo's mother and sister. Prior to Haber's evaluation, Izquierdo was told that the results of the examination would be given to his attorney and to Juan's attorney.

Based on Haber's discussions with Izquierdo, his mother and sister, and Juan's attorney, the Haber Report stated that Izquierdo: (1) was born with his umbilical cord tight around his neck, and as a result, he suffered a lack of oxygen and was developmentally slow;[3] (2) quit school in the eighth grade after being expelled for fighting several times, and was unable to learn to read or write; (3) ran away from home as a teenager because he did not want to receive psychological treatment; (4) never held a driver's license because he could not pass the test; (5)

---

[2]Haber administered the Wechsler Adult Intelligence Scale-III, the Wide Range Achievement Test-3, and the Bender Gestalt & Bender Gestalt Recall Test.

[3]Izquierdo's mother informed Haber that Izquierdo did not begin walking until age two, did not begin talking until age three, and did not learn to tie his shoes or dress himself until age nine.

4

suffered a concussion at age twenty-two; (6) has a history of frequent drug and alcohol use; (7) has trouble falling asleep; (8) did not understand everything that happened when he pleaded guilty, including the meaning of the word "parole"; and (9) did not ask questions at his plea colloquy because he did not want people to think he was stupid. Additionally, based on Haber's tests and observations, the Haber Report concluded that Izquierdo: (1) was "well oriented in all spheres with attention and concentration intact"; (2) had "coherent, productive and goal-oriented" thought processes; (3) when left alone, attempted to complete a problem that he had been unable to complete during his test, indicating his involvement in the process; (4) could add one-digit numbers with some mistakes, but could not add two-digit numbers; (5) knew the alphabet, but could not spell on a first grade level; and (6) had a generally inadequate "fund of information." The Haber Report concluded that intellectually, Izquierdo had an IQ of fifty-three to sixty-one, a range corresponding to "moderate to mild mental retardation, and that test results "suggest[ed] that he [was] not competent to proceed," although, notably, "[a] formal competency evaluation was not performed." The Haber Report recommended that a formal competency evaluation be conducted. Based on the Haber Report, the district court declared a mistrial in Juan's case.

### C.   The First FMC Report

Subsequently, on December 7, 2001 (four days before his scheduled sentencing), Izquierdo filed an unopposed motion for an independent psychological evaluation, supported by the Haber Report. On December 13, 2001, the district court granted Izquierdo's motion and recommended that Izquierdo's competency be evaluated at the Federal Medical Center in Butner, North Carolina ("FMC"). At the FMC, Izquierdo was evaluated by a psychiatric team led by Robert Lucking, M.D., ("Lucking"), a psychiatrist. On March 25, 2002, Lucking authored a report of his team's findings based on their evaluation of Izquierdo (the "First FMC Report").

Based on the FMC team's interviews with Izquierdo, the First FMC Report stated, among other things, that Izquierdo: (1) suffered a blow to the head in 1995, as well as other head trauma; (2) could not read or write; (3) had been treated eight times as a juvenile for drug and alcohol abuse, but had refused to consistently attend psychiatric treatment in spite of a recommendation that he receive such treatment; (4) did not sleep well; (5) suffered from mood swings but not hallucination; (6) had a history of anoxia (decreased oxygen to the brain); (7) never passed his driver's test, but drove anyway; and (8) often got lost, even while attempting to locate his own home.

6

The First FMC Report also noted, based on a multitude of tests[4] conducted by Lucking and his team, that Izquierdo: (1) was oriented to people and places, but not time; (2) had difficulty finding the correct words for objects; (3) performed simple memory tasks adequately, but could not recite the months of the year in correct order; (4) was able to count from one to twenty and twenty to one without error, but with some difficulty; (5) was below average in recalling ideas expressed in a story and was unable to think abstractly at any level using similarities, differences, or proverbs; (6) showed no significant language deficits, but showed a deficit in visual memory; (7) could not explain how similar items were related; (8) could draw simple two-dimensional and three-dimensional objects without issue, but struggled with drawing more difficult three-dimensional objects; (9) had a well below normal "fund of general information"; (10) lacked math ability and had difficulty putting letters in sequential order; (11) could not identify which object in a series was unlike the others; (12) understood the concept of "finders-keepers," and was able to explain correctly "why we have fire insurance," but was confused by the concept of planning a three-day trip from Miami to Tampa Bay and could

---

[4]According to the First FMC Report, Lucking's team administered the following procedures during Izquierdo's first evaluation: (1) clinical interviews; (2) behavioral observation; (3) physical examination; (4) Magnetic Resonance Imaging ("MRI") of Izquierdo's brain; (5) Bender Visual Motor Gestalt Test; (6) Bender Visual Motor Gestalt Recall Test; (7) Trail Making Test; (8) Rey Auditory-Verbal Learning Test ("RAVLT"); (9) Booklet Category Test ("BCT"); and (10) Validity Indicator Profile ("VIP").

not progress beyond the step of borrowing a car to make the drive. According to the First FMC Report, although Izquierdo's overall test results indicated no brain damage, they did indicate cognitive difficulties and memory impairments.

In the First FMC Report, Lucking noted some irregularities in Izquierdo's test results. On one test (the RAVLT), Lucking noted that Izquierdo performed worse than moderately impaired Alzheimer's and Parkinson's disease patients. Lucking also noted that Izquierdo may have been exaggerating his level of impairment on the BCT, because Izquierdo missed more than the usual number of easy questions on that test—items that are generally missed by less than five percent of brain-damaged people. Finally, Lucking observed that Izquierdo's responses on the VIP test indicated a lack of motivation and interest, and the First FMC Report concluded that Izquierdo's performance on the VIP "probably [did] not reflect his true ability."

Nevertheless, in the First FMC Report, Lucking ultimately concluded that Izquierdo: (1) had shown a basic consistency and no attempt to mislead, and had performed in a moderately to severely impaired range; (2) responded to some tests in a random manner and may not have demonstrated his true abilities on some tests; (3) suffered from "mild" mental retardation; (4) was not attempting to malinger and made a valid attempt to participate in the testing; and (5) made an

8

effort to disguise himself as functioning at a higher level to avoid humiliation. Finally, the First FMC Report determined that Izquierdo was not competent and was unlikely to become competent, and that Izquierdo did not understand the meaning of "guilty," "not guilty," or the nature and consequences of the criminal proceedings against him.

The First FMC Report also recommended that Izquierdo be returned to Butner for a period of 120 days, pursuant to 18 U.S.C. § 4241(d), to determine if his competency could be restored. Lucking later explained that if Izquierdo's "deficits" were due to an organic brain injury, it would be unlikely that Izquierdo could be restored to competency, but Lucking further indicated that "we wouldn't [have] be[en] able to tell for certain unless we had him back and we attempted to educate him regarding the trial process." Additionally, Lucking found no evidence of hallucinations or delusions. The First FMC Report cautioned that because Izquierdo's primary language was Spanish, his ability to read and write in English was not to be given excess weight in assessing his intelligence.

### D. Motion to withdraw and the first competency hearing

On May 6, 2002, Izquierdo filed a motion to withdraw his guilty plea and to be declared incompetent. Izquierdo's motion was based on the Haber Report and the First FMC Report. In response, the government advised the district court that

Oscar Diaz ("Diaz"), an inmate at the federal detention center where Izquierdo had been held, had told agents that Izquierdo had told Diaz, prior to Izquierdo's FMC evaluation, that he planned "to act crazy" in order to be found incompetent. The government also argued that Izquierdo acted rationally during his plea hearing and that Izquierdo himself demanded a plea concession from the government, demonstrating his lucidity and focus. The district court referred the issue to a magistrate judge, who ordered an evidentiary hearing.

The hearing took place on June 21, 2002. After Lucking was sent out of the courtroom, Diaz testified for the government. Specifically, Diaz testified that Izquierdo told him in December 2001 that Izquierdo was pretending to be "ill" and acting like he was "crazy" so that the doctors would find him mentally ill. According to Diaz, Izquierdo told him that in order to appear mentally ill, Izquierdo "told the doctor that he couldn't sleep, that he had a lot of headaches, that he had . . . visions at night . . . [and] that he felt like he was sick." When Diaz asked Izquierdo if all of that was true, Izquierdo explained that there was nothing actually wrong with him. Diaz also testified that he had seen Izquierdo reading books in his cell, writing postcards and poetry, and drawing tattoos. Diaz acknowledged that he once had to read a letter to Izquierdo because it was written in Spanish. Diaz further testified that he did not know that Izquierdo was born in

Spain and raised in the Dominican Republic.

Izquierdo's mother and Lucking also testified at the hearing, in a manner substantially consistent with their statements as recorded in the First FMC Report and the Haber Report. Izquierdo's mother stated that Izquierdo was born with the umbilical cord twisted around his neck and that he developed slowly. Lucking essentially reiterated his opinions contained in the First FMC Report, including that Izquierdo was incompetent.

However, Lucking acknowledged that it was possible that Izquierdo was being deceitful on two of the tests; that Izquierdo showed some inconsistencies during testing; that the MRI of Izquierdo's brain was normal; and that no test confirmed his family's claim that Izquierdo had suffered brain damage. Moreover, Lucking testified that at the time he first tested Izquierdo and wrote the First FMC Report, he was unaware of Diaz's claim that Izquierdo intended to malinger. Lucking further testified that if he had known about Diaz's claims at the time of the First FMC Report, he would have "look[ed] closer at the data, and . . . may have sought some additional confirmatory evidence that [he] did not seek." Lucking ultimately agreed that further evaluation of Izquierdo was necessary, testifying that he "would like to see . . . Izquierdo for some more time to reassess this."

11

Ultimately, the magistrate judge found it significant that Lucking acknowledged that he might have evaluated Izquierdo differently if he had known about Diaz's testimony at the time of the First FMC Report. As such, the magistrate judge ordered that Izquierdo be returned to the FMC for further evaluation.

## E.     The Second FMC Report

The government filed a second report after Lucking's team re-evaluated Izquierdo at the FMC (the "Second FMC Report"). In the Second FMC Report, dated February 13, 2003, Lucking concluded that Izquierdo: (1) was competent, understood the charges against him, and could assist in his own defense; (2) had attempted to mislead Lucking in the earlier evaluation; (3) did not suffer from brain damage; (4) was malingering; and (5) was functionally illiterate. In his second evaluation of Izquierdo, Lucking conducted: (1) clinical interviews; (2) a behavioral observation; (3) a physical examination; (4) the VIP test; and (5) the Minnesota Multiphasic Personality Inventory (second edition). All of these procedures were performed in Lucking's first evaluation, except for the Minnesota Multiphasic Personality Inventory. See supra note 4.

Lucking's new opinion was based on several factors, including: (1) Diaz's testimony; (2) letters given to Lucking by Izquierdo indicating that Izquierdo could

12

read and write, including one from Izquierdo's brother that said, "I want to hear from you too, and don't tell me no sh-t that you cant wright [sic], cause I've seen you do it"; (3) a statement from a government agent that surveillance indicated that Izquierdo did not appear to get lost while returning to his house, could use the Internet, had a Florida driver's license, could negotiate gun and drug sales, and bragged about eight prior robberies; (4) the government agent's belief that Izquierdo could have carried out a criminal plan; (5) Izquierdo's refusal to sign his Miranda[5] waiver until it was read to him; (6) inconsistent and exaggerated test scores that indicated to Lucking that Izquierdo was performing poorly on purpose, including the Minnesota Multiphasic Personality Inventory test, on which Lucking concluded that Izquierdo was "endorsing multiple psychological symptoms" in order to "appear more ill than he is"; (7) Izquierdo's participation in a cigarette trafficking scheme while at Butner; (8) Izquierdo's involvement in a gang at Butner; (9) Izquierdo's coherent provision of information to government agents regarding inmate activity while in prison; (10) Izquierdo's statement that he knew his actions to be wrong; and (11) information that Izquierdo had approached other inmates with a plan to frame another inmate for possession of a homemade knife.

---

[5]See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

13

## F.     Second competency hearing

The magistrate judge held a second competency hearing on June 10, 2003, at which Lucking testified that Izquierdo was, in fact, competent.  Among other things, Lucking testified that Izquierdo's test results were consistent with the test results from Lucking's prior evaluation, but, because there was no medical evidence of a brain injury, those test results now suggested to Lucking that Izquierdo was attempting to portray himself as mentally ill when he was not in fact mentally ill.  On cross-examination, Lucking also admitted that Izquierdo's ability to relay information to government agents was not relevant to Izquierdo's competency and that Lucking's expertise with tests designed to discover malingering was limited.

After Lucking's June 10, 2003 testimony, Izquierdo's counsel obtained permission to have Haber reevaluate Izquierdo.  After reexamining Izquierdo on September 24, 2003, Haber concluded that Izquierdo was not malingering.  Haber testified to that effect before the magistrate judge on March 2, 2004, and reiterated her opinion that Izquierdo was not competent to stand trial or enter a guilty plea and never would be.

## G.     Report and recommendation

Ultimately, on March 10, 2004, the magistrate judge issued a report (the

14

"R&R") that recommended that Izquierdo's motion to withdraw his guilty plea be denied. The magistrate judge found that Izquierdo had failed to meet his burden of establishing that he was incompetent. The R&R recounted at length Lucking's findings and opinions. The magistrate judge then expressly rejected Haber's opinion because, inter alia: (1) the historical evidence on which Haber had relied was supplied exclusively by Izquierdo and his family, and Haber did not have Izquierdo's medical records in order to verify Izquierdo's medical background; (2) Haber testified that she would have been "surprised" by information in the First FMC Report, despite the fact that she also testified that she had supposedly reviewed the First FMC Report; and (3) information from the department of motor vehicles contradicted Izquierdo's claims that he had never possessed a driver's license and could not read or sign his name, and Haber had found those claims significant in her evaluation. Finally, the magistrate judge noted that Izquierdo and his counsel made no competency objection at the time of his plea hearing and that the district court originally found Izquierdo competent to enter a guilty plea. The district court summarily adopted the R&R and determined that Izquierdo was competent to proceed to sentencing.

## H. Sentencing

Izquierdo's sentencing hearing took place on August 27, 2004. The plea

15

agreement stated that the government would recommend an offense level of thirty-two and no offense level enhancements.  In paragraph two of the agreement, Izquierdo expressly agreed "that consecutive mandatory minimum sentences of ten years as to each of [C]ounts II and III must be applied to the defendant."  Paragraph four of the agreement also contained Izquierdo's express acknowledgment that "the court must impose a minimum term of imprisonment of ten (10) years for [C]ount II, consecutive to a minimum term of imprisonment of ten (10) years for [C]ount III, and may impose a statutory maximum term of imprisonment of up to life imprisonment."  After reviewing a pre-sentencing report and conducting a sentencing hearing, the district court sentenced Izquierdo to two consecutive terms of 120 months' imprisonment, for a total sentence of 240 months' imprisonment.  Izquierdo does not appeal his sentence, but he appeals the denial of his motion to withdraw his guilty plea.

## II.    Standard of Review

A district court's denial of a request to withdraw a guilty plea is generally reviewed for abuse of discretion.  See United States v. Freixas, 332 F.3d 1314, 1316 (11th Cir. 2003).  The denial of a motion to withdraw a guilty plea is not an abuse of discretion unless the denial was "'arbitrary or unreasonable.'"  United States v. Weaver, 275 F.3d 1320, 1327 n.8 (11th Cir. 2001) (citation omitted).  A

16

district court abuses its discretion if it "fails to apply the proper legal standard or to follow proper procedures in making the determination, or makes findings of fact that are clearly erroneous." Birmingham Steel Corp. v. TVA, 353 F.3d 1331, 1335 (11th Cir. 2003) (citation, quotation marks, and alterations omitted).

We review a district court's decision on "competency to stand trial as a factfinding subject to reversal only for clear error." United States v. Hogan, 986 F.2d 1364, 1371 (11th Cir. 1993) (reviewing our Circuit's precedent on the proper standard of review for a motion for competency to stand trial).

## III. Discussion

We first examine whether the magistrate judge properly placed the burden of proof on Izquierdo.

### A. Burden of proof

A defendant-movant clearly has the burden on a motion to withdraw a guilty plea. See United States v. Buckles, 843 F.2d 469, 471 (11th Cir. 1988). That burden does not shift to the government when the basis of the withdrawal motion is incompetency at the time of the plea. See id. (noting that even in a case in which the defendant attempted to withdraw his guilty plea in part because of his "mental impairment resulting from a physical illness," the defendant had "the burden of showing a 'fair and just reason' for withdrawal of his plea"). This is especially

17

true here, where no concerns about Izquierdo's competency were raised at the time of the guilty plea and the district court conducted a plea colloquy and made a finding that Izquierdo was competent to enter his plea.

Further, the relevant competency statute arguably contemplates that the burden will lie with the party making a motion to determine competency. 18 U.S.C. § 4241. Specifically, 18 U.S.C. § 4241(a) provides that

> [a]t any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a). Moreover, the Supreme Court has stated, albeit in dicta, that the burden of establishing incompetence rests with the defendant. See Cooper v. Oklahoma, 517 U.S. 348, 362, 116 S. Ct. 1373, 1380 (1996) ("Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence.") (citing 18 U.S.C. § 4241); see also United States v. Robinson, 404 F.3d 850, 856 (4th Cir.) ("Under federal law, the defendant has the burden . . . '[to show] that the defendant is . . . mentally incompetent.'") (citing 18 U.S.C. § 4241 and Cooper), cert. denied, __ U.S. __, __ U.S. __, 126 S. Ct. 288,

18

126 S. Ct. 469 (2005).

Although Supreme Court precedent points in that direction, our predecessor court has stated that "[t]here can be no question that in federal criminal cases the government has the burden of proving [a] defendant competent to stand trial at the [competency] hearing." United States v. Makris, 535 F.2d 899, 906 (5th Cir. 1976)[6] (emphasis added) ("Makris II"). However, Makris II is not on point because it involved the government's pre-trial motion to determine the competency of the defendant, and did not involve a defendant's motion to withdraw a guilty plea based on incompetency.[7]

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit that were rendered prior to October 1, 1981.

[7]In United States v. Makris, 483 F.2d 1082 (5th Cir. 1973) ("Makris I"), the defendant (Makris) was charged with perjury based on his testimony before SEC. Before testifying before the SEC, Makris had brain surgery. Thus, "[p]rior to trial, the court on the government's motion appointed a highly qualified psychiatrist . . . to examine Makris and report to the court on his competency to understand the proceedings against him and to properly assist in his own defense." Makris I, 483 F.2d at 1089. Makris also filed a motion to suppress his testimony (claiming insanity at the time of the perjury offense), which was denied. Makris proceeded to trial and was convicted. In Makris I, our predecessor court affirmed the district court's conclusion that Makris was sane at the time of his offense. As to competency at the time of the trial, however, the Makris I court felt constrained to remand, because the district court had failed to conduct a formal competency hearing as required by the competency statute, and the psychiatrist's report "indicated a substantial possibility" that Makris was incompetent at the time of trial. Id. at 1090-92.

On remand, the district court conducted a competency hearing and concluded that Makris was competent to stand trial at the time. Makris appealed again, arguing, among other things, that the government should have been required to prove his incompetency beyond a reasonable doubt. Makris II, 535 F.2d at 905-06. Our predecessor court disagreed, concluding that although "in federal criminal cases the government has the burden of proving [the] defendant competent to stand trial" at the competency hearing," the government only had to establish the

19

More importantly, the competency statute in <u>Makris II</u>, 18 U.S.C. § 4244, was a different statute with different language than the competency statute at issue here.[8]  Section 4244, while also allowing competency motions to be filed by either the government or the defendant, placed more emphasis on the government's role in filing an incompetency motion.  <u>See</u> 18 U.S.C. § 4244 (1949) ("Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the <u>United States Attorney</u> has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, <u>he</u> shall file a motion for a judicial determination of such mental competency of the accused . . . . Upon such a motion or upon a similar motion in behalf of the accused . . . .") (emphasis added).

Accordingly, we conclude that <u>Makris II</u> is materially distinguishable, and <u>Buckles</u> is more on point.  Here, the district court found Izquierdo competent to enter his guilty plea, and this case is before us only on <u>Izquierdo's own motion</u> to withdraw his guilty plea.  As such, we need not resolve where the burden of proof

---

defendant's competence by a preponderance of the evidence.  <u>Id.</u> at 906.

[8]In 1984, 18 U.S.C. § 4244 was replaced by 18 U.S.C. § 4241.

lies in situations other than the narrow one before this Court. In light of <u>Cooper</u>, <u>Buckles</u>, and 18 U.S.C. § 4241, we conclude only that in the particular circumstances of this case, the district court did not err in placing the burden of proof on Izquierdo as to his own motion to withdraw his guilty plea based on incompetency.

## B.    Expert opinions

Given that the district court correctly allocated the burden of proof, we next consider Izquierdo's argument that the district court abused its discretion in denying his motion to withdraw his plea of guilty. Izquierdo's main contention is that the district court erred in rejecting Haber's opinion and in considering Lucking's revised opinion as to Izquierdo's competency at the time of his plea.

A district court's competency determination is primarily factual in nature. <u>See</u> <u>Hogan</u>, 986 F.2d at 1371. Moreover, in <u>Hogan</u>, which involved a challenge to the district court's finding that the defendant was competent, this Court concluded that "'[a] finding of fact is clearly erroneous only when we are left with a definite and firm conviction that a mistake has been committed.'" <u>Id.</u> at 1372 (citation omitted). We further indicated that in reviewing a district court's findings of fact for clear error, we must give "'due regard' to the trial court's opportunity to assess the credibility of witnesses," and noted that our review of a district court's

competency determination is "deferential." Id. (citation omitted).

The record here contains expert opinions that differ in their conclusions as to Izquierdo's competence. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985); see also United States v. De Varon, 175 F.3d 930, 945 (11th Cir. 1999).

Given the different expert opinions, Izquierdo mainly argues that the district court erred in considering Lucking's revised opinion. We disagree. Here, the First FMC Report reflects that even at the time of the first evaluation, Lucking had some concerns about Izquierdo possibly malingering. Specifically, in the First FMC Report, Lucking noted that Izquierdo had performed worse on the RAVLT than moderately impaired Alzheimer's and Parkinson's disease patients; that Izquierdo may have been exaggerating his level of impairment on the BCT; and that Izquierdo's performance on the VIP "probably [did] not reflect his true ability." Thus, it is not surprising that after Lucking was presented with Diaz's testimony at the first competency hearing, Lucking wanted to retest and reevaluate his data and opinion about Izquierdo. It is undisputed that Lucking was unaware of Diaz's allegations at the time he originally examined Izquierdo, and that Lucking was only informed of Diaz's story on the date of the first competency hearing. Lucking

22

candidly admitted that he needed to perform additional testing because of the new information. Lucking then conducted additional testing, and the Second FMC Report adequately explains why Lucking revised his previous opinion and found Izquierdo competent. We also note that Haber, a psychologist, spent a maximum of ten hours examining Izquierdo on two different days. By contrast, Lucking, a psychiatrist, studied Izquierdo for several months during Izquierdo's stays at Butner and had the benefit of the observations and information collected about Izquierdo by his forensic team. Lucking undisputedly examined Izquierdo more closely than did Haber, and he provided a reasonable explanation for changing his opinion. As such, we cannot say that the district court committed clear error in crediting Lucking's revised opinion that Izquierdo was competent.

Furthermore, the district court was not bound by Haber's opinion or the First FMC Report. It is well-settled that expert opinion as to competency is not binding on the trier of fact if there is reason to discount it. Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir. 1984). Here, the magistrate judge's R&R, which the district court adopted, provided cogent reasons for discounting Haber's opinion. Moreover, as discussed above, there was ample reason for Lucking's change of opinion from the First FMC Report to the Second FMC Report. The district court did not clearly err in rejecting Haber's opinion, in crediting Lucking's revised

23

opinion, and in finding Izquierdo competent.

## IV. Conclusion

For the foregoing reasons, we affirm the district court's denial of Izquierdo's motion to withdraw his guilty plea and, in turn, affirm his convictions.

**AFFIRMED.**