[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14097

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 12, 2010
JOHN LEY
CLERK

D. C. Docket No. 03-20951-CR-AJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARIADNA PUERTO,
EDUARDO ORLANSKY,
HECTOR ORLANSKY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 12, 2010)

Before O'CONNOR,[*] Associate Justice Retired, CARNES and ANDERSON,
Circuit Judges.

ANDERSON, Circuit Judge:

_____

[*]      Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States
Supreme Court, sitting by designation.

In this fraud and money laundering case, the three appellants challenge their convictions and sentences. Appellants were charged with conspiracy to commit bank and wire fraud, bank fraud, fraud by wire, conspiracy to launder money, and money laundering.[1] Appellant Hector Orlansky was also charged with making false statements to the FDIC, in violation of 18 U.S.C § 1007.

## I. FACTS AND PROCEDURAL HISTORY

Appellants Hector and Eduardo Orlansky were in the factoring business, a legitimate financing service whereby the factor advances its client 80% of the value of the client's accounts receivable. The factor then tries to collect the full amount of the accounts receivable from its client's customer. The factor also charges the client a fee and interest on the advance that accrues until the client's customer pays the account. Through related entities, the Orlansky family owned and operated a factoring business called Bankest Capital Corporation ("BCC") for many years. Eduardo ran the company and Hector began working there in 1993. Appellant Puerto worked her way up from office manager to vice president and eventually BCC board of directors member.

---

[1] Specifically, Appellants were indicted under 18 U.S.C. § 371, 18 U.S.C § 2, 18 U.S.C. § 1344, 18 U.S.C. § 1343, and 18 U.S.C. § 1956.

The fraud began as early as 1994 when Joy Athletic ("Joy"), one of BCC's largest clients, had a customer refuse to pay and its receivables became past due. A BCC employee proposed altering the receivable's due date, which Eduardo endorsed; the altered reports were sent to Barclays, the lender to BCC at that time. During 1994, BCC's advances to Joy exceeded the 80% maximum required ratio of advances to accounts receivable, and Joy began warning that it might go bankrupt. The Orlanskys decided to advance Joy more funds based on future invoices.

At this point, Barclays decided to end its relationship with BCC, and the Orlanskys arranged financing from the Espirito Santo Group ("ESG"), an international banking and finance enterprise based in Portugal, through its Miami-based FDIC-insured bank, Espirito Santo Bank ("ES Bank"), of which Hector was on the board of directors. ES Bank became the primary victim of the fraud. Initially, the money from ESG flowed to the Orlansky-owned entity Bankest Receivables Finance and Factoring Corporation ("BRFFC"). To raise funds, BRFFC issued debentures which ES Bank marketed to international clients. Because BRFFC offered debentures, it agreed to be audited annually.

At the time the Orlansky entities and the ESG entities entered into the financing agreements, in 1994, BRFFC was already "out of formula" with Joy

(i.e., had advanced funds to Joy in excess of 80% of the accounts receivable). This was concealed from ESG. Over time, the fraud escalated both in amount and complexity. By 1996, over 90% of the factoring business was tied to Joy, and Joy had been over-advanced $4 million. When Joy sought another $700,000, BCC agreed but required Joy's stock; after this, the Orlanskys considered themselves to be one-third owners of Joy. Neither the over-advances nor the ownership interests were disclosed to ESG.

The Orlanskys and other BCC executives discussed how Joy's true condition could be concealed from the auditors, B.D.O. Seidman. They agreed to alter computer and other records to fool the auditors. From that point on, Appellants continued to alter their records to make the business appear to be solvent. ESG relied on these audits in making its decision to become BCC's partner in 1998. In that year, ESG and BCC created a joint venture, ES Bankest ("Bankest").[2] Eduardo was chairman of the board of directors of Bankest, and Hector was its president and chief executive officer. Thus, the Orlanskys ran Bankest, while ES Bank's role in the venture was to market Bankest debentures to its international clients, thus providing funding for Bankest. Although Hector had pledged to Carlos Mendez – a co-conspirator who pleaded guilty and testified for

---

[2] ES Bank and BCC were each 50% shareholders in Bankest.

4

the Government – to run Bankest legitimately, he soon reneged and resumed fraudulent activity.

Over time, the fraud became exceedingly complex, all designed to conceal the true financial condition of the factoring business from the auditors and from the lenders (the ESG entities and the debenture holders). It began by altering the due dates on real accounts receivable. Later, Appellants and their co-conspirators created phantom accounts receivable. Periodic collateral certifications were falsified. Insurance reports were fabricated. The fact of unsecured advances to Joy and other clients were concealed, as well as the Orlanskys' equity interest in Joy and the true financial position of Joy. This and other conflicts of interest were concealed not only from the lenders but also from ES Bank, the 50% joint venture partner. Computer records were altered to fool the auditors and lenders and misrepresent the financial status of the business so as to make the business appear to be solvent and profitable. Appellants and their co-conspirators orchestrated complex transfers of funds between entities they controlled to hide the fact that clients were not paying back their advances or that accounts receivable were not being paid up. A few of the details of this extensive fraud follow.

One of the co-conspirators, Dominick Parlapiano, a key employee of the business, brought in a new client, CD Jewelbox ("CDJ") in 1997. In June 1999,

5

Appellants discovered that CDJ was in fact a sham company created by Parlapiano, which had no real receivables. Almost $10 million was advanced to CDJ, approximately $500,000 of which was lost, having been pocketed by Parlapiano. Although the Orlanskys confronted Parlapiano, instead of revealing this thievery to ESG or to the police, the Orlanskys and Parlapiano moved all of the CDJ accounts to another client and fake activity was generated for that client as a coverup. All three Appellants knew these details with regard to CDJ and participated in the coverup, which consisted in part of moving the debt to other accounts, such as client Enterprise Network Applications ("ENA"), a telecommunications software producer.

The Appellants engaged in a shifting of money between entities that they called "bicicleta," or cycling. By moving money between BCC and Bankest, and other entities, the Appellants created the appearance of payments on the debts. In what they called "bicicleta II," the Appellants wired money from BCC to a compliant client and the client then wired a similar amount back, purporting to be a payment from a customer.

Appellants also engaged in an extensive undertaking of creating fake invoices and checks, falsifying letters from clients certifying the inflated accounts receivable, altering computer records, and signing letters falsely attesting that the

6

Bankest financial statements were fair and accurate – all to pass the yearly audits. Similarly, the documents Hector submitted to the FDIC were full of misrepresentations.

The scheme began to unravel in Fall 2001. ES Bank had already wanted to reduce funding to Bankest when BCC learned that client United Container had filed for bankruptcy. The Orlanskys decided not to disclose this to ES Bank but in February 2002, the ES Bank president learned and confronted them. Eduardo told the president that the bankruptcy was recent; however, the president soon learned that not only was the bankruptcy not recent but that Bankest had been involved in the proceedings. In late February, ES Bank decided to terminate the joint venture and offered to acquire BCC's half interest in Bankest for $10 million. Out of fear that the fraud would be discovered, the Orlanskys counter-offered to buy out ES Bank's share and the bank agreed. Using funds that were mostly Bankest's, the Appellants amassed the required funds; $7 million of the $10 million purchase price was Bankest money. Because the purchase meant that the flow of money from debentures stopped, the Orlanskys applied to ESG's principals for refinancing of Bankest's debt and the parties reached a restructuring agreement in November 2002 for the outstanding debt of $172 million. However, because Bankest had very little business and no new funding, it stopped making payments.

As a result, ESG sued Bankest in July 2003, and the court appointed Lewis Freeman as examiner. Employees Parlapiano, Mendez, Puerto, and Ambrosiani balked at lying to the examiner while the Orlanskys assured them that these were only "white lies." Freeman attempted to contact the clients to collect and by the time of the trial in 2006, he had only collected $5 million on the $220 million receivables; Bankest owed ESG $170 million.

The Appellants were indicted in December 2003 for conspiracy to commit bank and wire fraud, bank fraud, wire fraud, conspiracy to commit money laundering, and money laundering; Hector was also indicted for making false statements to the FDIC. Appellants were indicted along with Otto Ambrosiani, Jeffrey Barnhill, Carlos Mendez, Parlapiano, and Howard Cantor, who all pled guilty. Mendez provided extensive testimony for the Government. Appellant Eduardo Orlansky argued that he was incompetent to stand trial and the district court held several hearings, as discussed in detail below, before rejecting his contention. Appellants proceeded to trial with Peter Stanham, who has not appealed. The jury convicted the Appellants on half of the counts, finding them guilty only of the charges that pertained to fraud that occurred after 1999. The Orlanskys were each sentenced to 240 months' imprisonment, Puerto was sentenced to 84 months, and all were ordered to pay restitution in the amount of

$164,597,310.11.

## II. DISCUSSION

### A. Hector Orlansky – Sufficiency of the evidence

Hector argues that there was insufficient evidence to support his convictions because he was just a figurehead of the company and not involved in any of the financial transactions. Instead, he asserts, the fraud was perpetrated by members of the middle management, specifically Parlapiano, and he knew nothing of it.

We agree with the Government that there is more than sufficient evidence to support Hector's convictions. First, there was testimony that Hector approved the transfer of fake receivables, breaking his pledge to run the Bankest business "clean." Additionally, Mendez's testimony directly rebuts Hector's arguments that he was duped; Mendez testified to many meetings where over-advances were discussed and Hector was present. Hector also attended meetings where the employees discussed how the Joy situation could not be disclosed to ESG. And, he continued to represent to ESG that CDJ was a substantial asset even after he learned that it was a sham.

Much of Hector's argument is a credibility challenge to Mendez because it was Mendez's testimony that placed Hector at the key meetings and with the

incriminating knowledge. We will not disturb a jury's credibility determination unless the testimony is "incredible as a matter of law." United States v. Flores, 572 F.3d 1254, 1263 (11th Cir. 2009) (quotation omitted). Hector has not shown that the testimony was incredible, and there is significant documentary evidence that Hector knew what was going on and participated. For instance, the Government introduced into evidence Hector's seven-page letter denouncing the FDIC, objecting to the idea that Bankest buy more insurance, and accusing ES Bank of violating the shareholder agreement. Additionally, ES Bank president Balestra testified about Hector's attendance at almost all Bankest board meetings, his "fierce" resistence to the FDIC's request for information, and his insistence on using the same auditor BCC had always used for Bankest rather than Price Waterhouse. The jury clearly rejected Hector's argument that he unknowingly signed whatever was put in front of him.

For the money laundering counts, the Government needed to show concealment of funds. Concealment can be shown by evidence of unusual structuring, structuring of transactions to avoid attention, highly irregular features of the transaction, using third parties to conceal the real owner, or a series of unusual financial moves cumulating in the transaction. See United States v. Majors, 196 F.3d 1206, 1213 n.18 (11th Cir. 1999). Here, the BCC employees

10

agreed that Joy's overadvance and the CDJ sham could not be revealed, and numerous transactions were falsely attributed to Joy, ENA, CDJ, and others. The transactions were designed to create the impression that there was money, when in fact there was none. That was the sole purpose of the transactions although the larger fraud was intended to result in personal gain. As in Majors, the Appellants here used third parties (e.g., controlled entities, Joy and other compliant companies) to filter the money back and forth, under the bicicleta II fraud scheme. The Government showed Hector's knowledge through testimony by government financial expert Lew Sellers about the cycling and by Mendez that Hector did more than just sign checks – e.g., he referred to the transactions as "bicicleta." Additionally, Hector knew that ENA had very little income and yet he approved the transfers in ENA's name as if it was paying remittances.[3]

---

[3] To the extent that Hector argues that his conviction will not stand in light of United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020 (2008), we rejected that argument in United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009). There, we stated that "Santos has limited precedential value. Three parts of Justice Scalia's four-part opinion are for a plurality of justices, and those parts do not state a rule for this case. . . . The narrow holding in Santos, at most, was that the gross receipts of an unlicensed gambling operation were not 'proceeds' under section 1956." Id. Because Hector was not convicted of operating an unlicensed gambling operation, Santos does not apply. See also United States v. Jennings, 599 F.3d 1241 (11th Cir. 2010) (applying Demarest's analysis of Santos in a mail and wire fraud case).

Moreover, Hector made no such argument in the district court; therefore, his argument is subject to plain error analysis. Even if Santos applied in a bank and wire fraud context, as here, Hector could not satisfy the third and fourth prongs of the plain error analysis. The third prong is "the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court's proceedings." Puckett v. United States, __ U.S. __, 129 S. Ct. 1423, 1429 (2009) (internal quotations omitted). Unlike the

11

B. Hector's Motion for Bifurcation or Mistrial

Hector's argument regarding the motion to bifurcate and Puerto's motion to sever pertain to the same issue: whether Puerto's defense was antagonistic to the other Defendants'. In essence, Puerto's defense was that she did not know what was really going on and to the extent that she did, she was afraid that she would lose her job because the Orlanskys had fired a whistleblower earlier. During cross-examination of Mendez, when this became apparent, Eduardo's attorney moved for a severance; Hector adopted the motion. The court, however, denied the motion. All of the defendants but Puerto had already completed their defenses at this point so they moved to bifurcate the trial. They proposed proceeding to their closing arguments and having the jury decide on their guilt or innocence, all before Puerto's defense. After the verdict, the same jury would then hear Puerto's defense and deliberate her fate. The Government opposed the proposal. After taking a proffer of Puerto's defense, the district court decided not to bifurcate. The other defendants renewed their motion when Puerto elicited testimony that

situation in Santos, Hector has not shown that the transactions underlying his money laundering convictions involved paying expenses of the fraudulent business; thus, even if Santos principles were applicable, Hector has not shown that the transactions would not be "proceeds." In other words, Hector has not shown that the outcome in the district court would have been different. And, with respect to plain error's fourth prong, it is clear that fairness, integrity or public reputation of the judicial proceedings would not prompt an appellate court to exercise discretion in favor of Hector in this regard.

she was scared to approach the Orlansky brothers because of an earlier whistleblower's firing. The court again denied the motion.

The district court did not abuse its discretion. See United States v. Knowles, 66 F.3d 1146, 1159 (11th Cir. 1995) (reciting standard of review). First, the court gave a curative instruction regarding the statement that Puerto was afraid of the Orlanskys. Puerto elicited from her husband while he was testifying that she was afraid of the Orlanskys because they had fired a whistleblower and then the Government elicited a similar statement, to which Eduardo's attorney objected. The court instructed the jury to

> disregard Mr. Puerto's testimony other than what he told his wife. . . . Whatever Mr. Puerto has testified to here, which is based upon things that Ms. Puerto said, or things he learned from someone else, for example, the testimony he just gave, that testimony is stricken. You are to disregard it and not consider it in any way whatsoever. The same goes for prior testimony concerning what Ms. Puerto said she believed might happen as a result of what she and her husband apparently discovered.

We have held that we will only reverse a refusal to grant a mistrial when the evidence is "so highly prejudicial as to be incurable by the trial court's admonition." United States v. Perez, 30 F.3d 1407, 1410 (11th Cir. 1994). Hector has failed to persuade us that this evidence was so highly prejudicial that it would not be cured by this instruction.

13

Second, this court has expressed concern over bifurcation of trials; specifically, it has worried that the jury who determines the guilt of the first defendants may not be impartial when faced with the later-decided defendants. See United States v. McIver, 688 F.2d 726, 729 (11th Cir. 1982). As Hector admits, the decision of whether or not to bifurcate requires a balancing of competing interests. Here, the district court determined that the defendants' defenses were not antagonistic, let alone antagonistic enough to overcome the competing interests of efficiency and concerns about prejudice to the remaining defendant. The court found that Puerto's defense – that the fraud was not obvious to low-level employees – was not antagonistic to the Orlanskys' theory of defense that the middle-level managers Parlapiano and Mendez orchestrated the fraud and kept the brothers in the dark. "[T]o compel severance, the defenses of co-defendants must be more than merely antagonistic, they 'must be antagonistic to the point of being mutually exclusive.'" Knowles, 66 F.3d at 1159. Lack of knowledge on the part of both the Orlanskys and the low-level employees is certainly not antagonistic.

Third, the court rejected most of Puerto's proffer of state of mind evidence, allowing her only to elicit testimony about her state of mind from family members, without getting into the nature of why she felt the way she said she felt. Any

14

evidence of her fears was brought in through her family members and did not constitute significant testimony. Therefore, we conclude the court did not abuse its discretion.

### C. Puerto's motion to sever

Puerto argues that the district court's denial of the motions to sever denied her the opportunity to introduce essential exculpatory evidence. Puerto sought to introduce statements made to the FBI by two of her low-level co-workers to the effect that they did not realize there was fraud occurring at the firm. This evidence demonstrated her lack of knowledge, she argues, because these workers were the ones that trained her and did many of the same tasks. Puerto tried to call the co-workers but each invoked the Fifth Amendment and refused to testify. Then, Puerto's co-defendants each objected to the admission of the FBI statements on the basis that the admission would violate their Confrontation Clause rights. Puerto argues that this is a rare case of a defendant suffering prejudice simply because of a joint trial.

We review the district court's decision for abuse of discretion. Zafiro v. United States, 506 U.S. 534, 541, 113 S. Ct. 933, 939 (1993). There the Court held: "We believe that, when defendants properly have been joined under Rule

15

8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539, 113 S. Ct. at 938.

We do not believe the district court abused its discretion when it denied Puerto's motion to sever because she could not have introduced the FBI statements in a severed trial. Statements to the above effect would have been inadmissible hearsay and did not fall under the exception for statements against penal interest under Fed. R. Evid. 804(b)(3).[4] Under that rule, hearsay statements will be allowed into evidence if the statement inculpates the declarant. The substance of the testimony Puerto wanted to introduce here was the opposite: it served to exculpate the declarants because the declarants were denying any knowledge of wrongdoing.[5] Therefore, the statements would not have been admissible even in a

---

[4] Fed.R.Evid. 804(b)(3) provides:
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

[5] The only exculpatory evidence to which Puerto points in her brief on appeal is the "critical portions of their FBI statements which stated that they never thought the Orlanskys were doing fraud." Puerto's Brief at 39. Thus, the only exculpatory evidence identified by Puerto was

16

separate trial.[6]  The district court also properly found that the evidence was cumulative because Puerto elicited from Mendez on cross-examination that the co-workers performed functions like Puerto's and were not told of the fraud. Accordingly, Puerto has not pointed to the compromise of a specific trial right, nor has she made a persuasive case that the jury was prevented from making a reliable judgment.  We cannot conclude that the district court abused its discretion.[7]

### D.  Hector's Sentence

Hector argues that the district court erred in assessing him a two-level increase in his offense level for sophisticated laundering under § 2S1.1(b)(3). Hector submits that he did not engage in the planning of the layering of

---

not against interest and was not properly admissible even in a separate trial.

[6]  We also reject Puerto's argument that the evidence could admitted under Fed. R. Evid. 807, the residual hearsay exception.  Under that rule, hearsay evidence not fitting under Rule 803 or 804 but "having equivalent circumstantial guarantees of trustworthiness" is admissible. However, the statements here are not worthy of trust because of their very nature as exculpatory statements.  See Williamson v. United States, 512 U.S. 594, 600-01, 114 S. Ct. 2431, 1435 (1994) ("Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false").  Therefore, we reject Puerto's alternative rationale for admission of the statements.

[7]  To the extent that Puerto argued for the first time at oral argument that other aspects of the FBI statements were against interest, therefore were admissible, and rose to the level of the requisite prejudice mandating severance, we decline to address such belated argument.  Moreover, we believe any such evidence was both cumulative of evidence actually presented to the jury and also of minimal probative value.

17

transactions that took place, and that although the jury found him guilty of various conspiracy charges, the level of sophistication for this enhancement was entirely attributable to another individual.

Section 2S1.1(b)(3) of the Sentencing Guidelines provides for a two-level increase in a defendant's offense level if he was convicted under 18 U.S.C. § 1956 and "the offense involved sophisticated laundering." The commentary provides that "sophisticated laundering" means "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." U.S.S.G. § 2S1.1, comment. (n.5(A)). The commentary continues, "Sophisticated laundering typically involves the use of—(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." Id.

This Court reviews a district court's findings of fact for clear error and its application of the Sentencing Guidelines de novo. United States v. Gupta, 572 F.3d 878, 887 (11th Cir. 2009). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Robertson, 493 F.3d 1322, 1330 (11th Cir. 2007) (quotation

omitted).

The district court did not clearly err in assessing Hector an enhancement for sophisticated laundering. The court found that the "cycling of money" enabled the fraud to continue, and that the cycling constituted "layering" as described in the commentary to § 2S1.1(b)(3). Hector was involved in a wire-transfer scheme involving the circular transfer of funds between various companies to create the illusion of revenues that enabled the perpetuation of the fraud. Hector was one of only three individuals authorized to sign the checks and underlying wire-transfer forms. This cycling of funds constitutes "two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate," such that the district court did not clearly err in assessing Hector the enhancement.

Next, Hector argues that his 20-year sentence was "clearly and unequivocally unreasonable" because it was "quite possibly a death sentence." He argues that the mitigating circumstances, specifically his age, health, and lack of a prior criminal record, militated in favor of a lower sentence.

We will remand for resentencing only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range

of reasonable sentences dictated by the facts of the case." United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008) (citation and quotation marks omitted).

Here, there was no clear error. Although the district court stated that several § 3553(a) factors (e.g. health and age) supported Hector's not receiving a lengthy term of imprisonment, the court noted that some of the § 3553(a) factors called for a "very severe sentence." In particular, with respect to the nature of the offense, the court noted that the case involved a "huge amount of loss" and noted that approximately $167 million in loss was "a staggering sum." Additionally, the court noted that the crime took place "over a period of years" and found that Hector knew, at least as early as the middle of 1998, that a fraud was taking place. The court determined that the scheme was intended to further Hector's financial interest and pointed out that his sentence was not different from that received by another individual involved in the offense who had pled guilty. Moreover, the court reasoned that the need for the sentence to constitute sufficient punishment supported a severe sentence, given the "large-scale, massive bank fraud," which was the "largest bank fraud that the Southern District has seen." We agree with the district court that the record supported the sentence.


E. Puerto's sentence

20

Puerto argues that her sentence was procedurally unreasonable because the district court incorrectly calculated her guideline range. Specifically, she argues that the court's calculation of the loss amount was improper because it was based on facts not found by a jury beyond a reasonable doubt. Puerto acknowledges that this Court and the Supreme Court permit such judicial fact-finding by a preponderance of the evidence, but she submits that her case presents the rare example where such fact-finding is impermissible because of the enormous increase that resulted from finding $167 million in loss attributable to her.

Puerto's sentence was procedurally reasonable. Her only argument is that the district court erroneously calculated her guideline range because it based the loss calculation on facts the court found by a preponderance of the evidence. However, this Court's precedent permits a court to base guideline enhancements on facts it finds by a preponderance of the evidence, as long as the court treats the Guidelines as advisory and does not impose a sentence that exceeds the maximum permitted by the jury verdict. See United States v. Douglas, 489 F.3d 1117, 1129 (11th Cir. 2007); United States v. Campbell, 491 F.3d 1306, 1314 n.11 (11th Cir. 2007). Here, the district court treated the Guidelines as advisory and did not impose a sentence above the statutory maximum authorized by the jury verdict. Therefore, the court was authorized to calculate the amount of loss based on facts

it found by a preponderance of the evidence and we affirm her sentence.

F. Eduardo's Mental State

1.      Eduardo's challenge to the district court's exclusion of his experts' mental health testimony

Eduardo sought to introduce evidence about his diminished mental state during the relevant time period for three reasons. The first was to support his insanity defense under the Insanity Defense Reform Act ("IDRA"), 18 U.S.C. § 17 (2000). Second, he sought to introduce the evidence as a means of challenging the Government's argument that he had the requisite mens rea to commit the charged crimes. Third, he sought to introduce evidence of his diminished mental state to support his claim that he had been kept in the dark about the fraud and it had been orchestrated by lower level management.

Eduardo submitted a Notice of Insanity Defense and Expert Evidence of Mental Condition, which included reports from neuropsychologist Dr. Barry Crown and neurologist Dr. Jeffrey Gelblum (Eduardo's treating neurologist). He also included the report from an MRI, which reportedly showed evidence of an old stroke in his left caudate nucleus and a large, "very old" fluid accumulation in his left temporal and temporal frontal region, which probably resulted from a stroke. In response, the Government moved to exclude evidence that Eduardo suffered

22

from a mental defect, for a <u>Daubert</u>[8] hearing, and to exclude the testimony of the two doctors. The district court excluded the testimony of the two doctors both because it was inadmissible under the IDRA and because it was inadmissible under Fed. R. Evid. 702 and <u>Daubert</u>. Eduardo challenges both rulings; we address each in turn.

a. The legal standard under the IDRA

Under the IDRA, insanity is an affirmative defense that the defendant must prove by clear and convincing evidence. 18 U.S.C. § 17; <u>United States v. Westcott</u>, 83 F.3d 1354, 1357 (11th Cir. 1996). The Act restricted the definition of insanity:

> at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a). Before the Act's passage, a defendant could also assert a valid defense if he was unable to conform his conduct to the requirements of the law. <u>United States v. Freeman</u>, 804 F.2d. 1574, 1576 (11th Cir. 1986). However, as the second sentence of the Act recites, Congress prohibited the use of "'non-insanity' psychiatric evidence that points toward 'exoneration or mitigation of an offense

---

8       <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993).

23

because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection.'" United States v. Cameron, 907 F.2d 1051, 1066 (11th Cir. 1990). "Congress intended to prohibit the presentation of evidence of mental disease or defect, short of insanity, to excuse conduct." Westcott, 83 F.3d at 1357-58. In passing the IDRA, Congress considered that such prohibited evidence would, if allowed to go to the jury, resurrect the former, broader version of the insanity defense "in the guise of showing some other affirmative defense, such as . . . diminished responsibility . . . and open the door, once again, to needlessly confusing psychiatric testimony." Cameron, 907 F.2d at 1066 (quoting S. Rep. No. 98-225, 98th Cong., 2d Sess. 229 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3411) (internal punctuation omitted). However, we have held that Congress did not intend to exclude the use of psychiatric evidence that negated specific intent. Westcott, 83 F.3d at 1358; Cameron, 907 F.2d at 1066-67.[9] We examine the testimony of each of the proffered experts in turn.

i. Dr. Jeffrey Gelblum

Eduardo's treating neurologist testified at the four-day hearing in November

---

[9] The distinction mentioned in the case law between psychiatric evidence that negates specific intent, on the one hand, and psychiatric evidence that a defendant does not have the capacity to form specific intent, on the other hand, is not relevant in this case. See Westcott, 83 F.3d at 1358; Cameron, 907 F.2d at 1066-67; see also United States v. Pohlot, 827 F.2d 889, 903-05 (3d Cir. 1987).

24

2005 about his diagnosis of Eduardo, the etiology of Eduardo's illness, and his opinion about Eduardo's mental state. He testified that he had diagnosed Eduardo in 2004 with progressive vascular dementia based on reports by his family of deficits in activities of daily living and an MRI and an electroencephalogram ("EEG"), neurological tests that pinpoint the dementia's causes. The MRI showed that a region in Eduardo's brain's left hemisphere was cavitated out, meaning that the brain tissue had been replaced with fluid. Dr. Gelblum testified that Eduardo had significant damage to the left temporal lobe, the left frontal lobe, and the left parietal lobe, which suggests interference of brain functioning in a critical part of the brain. He explained that the left side of the brain primarily controls right-sided body function, as well as comprehension, arithmetic, executive planning, and fluency. Memory is also impaired with this type of injury, with short-term memory being most prominently affected because it is relegated to the left temporal lobe.

Dr. Gelblum opined that the damage to Eduardo's brain was caused by an arachnoid cyst and superimposed stroke syndrome. Arachnoid cysts are congenital, meaning that the patient was born with the cyst, and Dr. Gelblum explained that superimposed stroke syndrome refers to small, "silent" strokes. While the MRI could not give an exact date of onset, Dr. Gelblum speculated that

25

the degree of whiteout in the brain suggested that the damaged area had been fluid-filled for "six, seven, [or] eight years." But he conceded that because he did not have access to previous MRIs, he could not determine if the cyst had been growing or if it had been that size since birth; the MRI and the EEG could only provide a snapshot of the patient's current condition.

At the time that Dr. Gelblum began to treat Eduardo, in May 2004, Dr. Gelblum thought that Eduardo was legally insane. However, he testified that there is no scientifically valid way for him to ascertain Eduardo's mental state before that time. Additionally, he agreed that talking to family about the patient's past behaviors could not scientifically determine the patient's mental state in years past. When asked if there was any scientifically reliable way of determining if Eduardo had the capacity to deceive during the period from 1994 to 2003, Dr. Gelblum answered "we don't have those scans or studies, no."

Because Dr. Gelblum testified that he relied upon the reports of family and friends to make diagnoses, Eduardo introduced evidence from Eduardo's wife, Jane, and later trial testimony from his former employee, Mendez. Jane Orlansky testified that Eduardo had begun to act strangely beginning in 1992 or 1993, engaging in what she termed ritualistic behavior. She also noted a decline in his intelligence and short term memory. However, she testified that she did not

recommend to him that he seek any professional or medical help for the strange behavior that he began to exhibit. Similarly, Mendez testified to Eduardo's ritualistic behavior. Although Jane Orlansky's and Mendez's testimony may have suggested that Eduardo was beginning to develop dementia during the time period at issue, Dr. Gelblum did not testify that, on the basis of the testimony of Jane and Mendez, he could opine with any degree of medical certainty about Eduardo's state of mind at the relevant time period such that a fact-finder could infer that Eduardo was unable to appreciate the nature and quality or wrongfulness of his actions during the relevant time period.[10]

While Dr. Gelblum testified that accounts from family of behavior and patient history comprise ninety-five percent of the information required for diagnosis, as the district court noted, Dr. Gelblum did not state that he relied on those accounts in his letters or reports when he wrote that, at the time of the crimes, Eduardo suffered from severe mental defect such that he could not appreciate the wrongfulness of his actions. And he affirmatively testified that he could not render an opinion about Eduardo's ability or capacity to lie during that

---

[10]    Furthermore, one of the Government's experts, Dr. David Fishbain, reviewed Eduardo's business writing, correspondence and notes made from 1996 to 2003 and discerned no signs of mental or cognitive deterioration. Additionally, Dr. Fishbain noted that Eduardo made no complaints about forgetfulness, anxiety or being upset to his primary care physician until late 2004, after he was being treated by Dr. Gelblum and after he had been indicted.

period. Although he did try to rectify his opinion by testifying that he could rely on family reports to make a retroactive diagnosis, he did not testify that he could opine with any degree of medical certainty that Eduardo was unable to lie or deceive at the time of the crimes.

ii. Dr. Barry Crown

Dr. Crown is a neuropsychologist who administered a series of psychological tests to Eduardo in order to ascertain the severity of the damage caused by the arachnoid cyst and the stroke syndrome identified by the neurologists. His report stated that he would testify that at the time of Eduardo's involvement in the criminal acts, Eduardo was suffering from vascular dementia with significant cognitive loss. Further, he wrote, Eduardo, "at best, would have been performing at a twelve year old level" on his language-based critical thinking and abstract problem-solving ability.

During the hearing, Dr. Crown testified that all of the tests he administered to Eduardo only showed Eduardo's capabilities at the time of the tests' administration. When asked specifically if he could testify as to Eduardo's mental condition during the relevant period of the case, he stated that could not provide an opinion. He testified that his statement in the report was based on his understanding that Eduardo was not in the acute stage of the illness and that his

28

illness had been progressing for some time. However, he admitted that he had no way to "date stamp it," and that the rate of decline varies by individual. The district court then asked Dr. Crown if he could say "to any degree of medical certainty when that significant cognitive loss occurred?" Dr. Crown replied: "No, other than Mrs. Orlansky relating to me that she felt that he deteriorated, and that there were problems at or about the time of a civil lawsuit that took place well over ten to 12, 14 years ago. But that's the only historical bit of information that I have that suggests a point of noticeability." Finally, when asked if he could state with any degree of scientific certainty that Eduardo was insane at any point during the ten-year period that the charge embraced, Dr. Crown answered no.

iii. Analysis

The district court properly noted that the IDRA allows a defendant to put on an affirmative defense that, as a result of a severe mental disease or defect, he was unable, at the time of the commission of the acts constituting the offense, to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. §17(a). We also noted above that in the IDRA, Congress intended to prohibit the use of non-insanity psychiatric evidence that points to exoneration or mitigation of an offense, but that Congress did not intend to exclude the use of psychiatric evidence that negated specific intent. Westcott, 83 F.3d at 1358; Cameron, 907

29

F.2d at 1067. However, the IDRA specifically requires that such evidence focus on the defendant's state of mind at the time of the charged offense. See Cameron, 907 F.2d at 1067 ("Evidence offered as psychiatric evidence to negate specific intent is admissible, however, when such evidence focuses on the defendant's specific state of mind at the time of the charged offense.") (internal quotations omitted).

Eduardo's problem is that neither Dr. Gelblum nor Dr. Crown could provide testimony about what Eduardo's state of mind was at the time of the charged acts. At most, they could speculate that he had begun to decline during that period, but they could not opine with any degree of medical certainty about Eduardo's state of mind (or the level or degree of his mental deficiencies) during the relevant time period.* Moreover, because they did not know what his mental state was during

---

\* In his petition for rehearing, Eduardo argues for the first time that the district court erred by insisting that, to be admissible, Dr. Gelblum and Dr. Crown would have to have testified to the ultimate issue – i.e., that Eduardo lacked the ability at the relevant time to appreciate the nature and quality or wrongfulness of his acts. Eduardo now argues that the district court erred in insisting upon testimony on the ultimate issue because such testimony is prohibited by Fed.R.Evid. 704(b). Although it is true that the doctors did at some point testify without objection that they were unable to opine with any degree of medical certainty as to that ultimate issue, they also repeatedly testified to a similar inability to opine generally with respect to Eduardo's mental state at the relevant times (including the timing of significant cognitive loss). The district court construed the doctors' candid admissions as indicating that there was a paucity of evidence with respect to Eduardo's state of mind at the relevant times, such that the two doctors could not opine with the requisite medical certainty that Eduardo suffered from dementia with significant cognitive loss during the relevant time period. We cannot conclude that the district court abused its discretion in this regard.

30

the relevant time, they also could not opine with any degree of medical certainty

with respect to his mens rea during the relevant time period.  For this reason, the

district court held that the IDRA rendered  the testimony of the two doctors

inadmissible.

The district court (Judge Adalberto Jordan) exhaustively explored this

evidence and its admissibility.  First it held a four-day hearing in November 2005,

during which it actively questioned the experts and after which it produced two

well-reasoned and comprehensively analyzed orders excluding the evidence.

Additionally, the court undertook reconsideration of the decision mid-trial and

again determined that the evidence could not meet the IDRA's standards.[11]  In

[11]     Eduardo moved again mid-trial seeking reconsideration of the district court's decision to exclude the testimony of the doctors.  Eduardo relied on the trial testimony of employee and co-conspirator Mendez about Eduardo's behavior during the relevant time, to wit: that some of Eduardo's business decisions made no sense; that he had trouble understanding financial documents; that he had memory problems; and that he engaged in some ritualistic behaviors.  The FBI statement of another employee also reported ritualistic behaviors, like repeatedly putting out his cigarette by pressing it against the bottom of the ashtray for an inordinate amount of time.  Eduardo did not proffer sworn testimony of either doctor to the effect that the new evidence would permit them to testify with any degree of medical certainty as to Eduardo's state of mind as of the relevant time period.  However, Eduardo did proffer brief emails from the two doctors.  The district court concluded that the emails were "conclusory and provide little to no basis for the opinions offered."  We have considered the testimony of Mendez and the statement of the other employee as well as the emails.  We cannot conclude that the district court abused its discretion.  The emails are conclusory; they fail to explain how the actions described would indicate either the timing or the degree of any cognitive impairment.  Moreover, especially in the absence of expert testimony, we doubt that the behaviors described could indicate cognitive impairment to a degree that mens rea would be negated.  For example, the most significant behaviors – poor business judgment and trouble understanding financial documents – would not seem to indicate cognitive impairment to the extent that a person would not realize that it is wrong to fabricate accounts receivable in order to mislead one's lender and

view of the careful and comprehensive consideration by the district court,[12] and because neither doctor could testify with any degree of medical certainty about Eduardo's state of mind at the relevant times we cannot conclude that the district court abused its discretion in excluding the testimony of Dr. Gelblum or Dr. Crown.[13]

b. Rule 702 of the Federal Rules of Evidence

The district court also denied admission of the testimony based on Rule 702 of the Federal Rules of Evidence, which controls the admission of expert

---

joint venture partner. In any event, in the absence of expert testimony to that effect, we cannot conclude that the district court abused its discretion. We also note that after his indictment, Eduardo's own doctors initially opined that Eduardo was competent to stand trial.

[12] In addition to the hearings the district court held on the evidence of Eduardo's mental state, it held a four-day hearing on the related issue of Eduardo's competency before trial began and ordered both an in-patient evaluation and an independent expert evaluation of Eduardo's competency. Moreover, as discussed below, the court re-examined Eduardo's competency both during the trial and after it, producing detailed analyses of the experts' testimony and demonstrating an extensive understanding of Eduardo's mental condition.

[13] We noted above in Part II.F.1 that Eduardo sought to introduce the testimony of the two doctors for three purposes: first, to support his insanity defense; second, to negate mens rea; and third, to support his claim that he had been kept in the dark about the fraud. The district court's opinions, and our own opinion in the text above, specifically address the issue only with respect to its use to support the insanity defense, and to negate mens rea. However, the same rationale applies with equal force to Eduardo's attempt to use the evidence to support his claim that he had been kept in the dark about the fraud. We can assume arguendo, but we expressly do not decide, that the IDRA would not present an absolute bar to the use of psychiatric evidence for this third purpose. However, even assuming that, it is clear that the IDRA would require that the evidence be focused on defendant's state of mind at the time of the crime. Because the evidence of the two doctors was not thus focused, the district court did not abuse its discretion in implicitly holding that the IDRA renders the evidence inadmissible for this third purpose also.

testimony.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has instructed that Rule 702 compels the district courts to perform a critical "gatekeeping" function concerning the admissibility of expert scientific evidence.  Daubert v. Merrell Dow Pharm., 509 U.S. 579, 589 n.7, 597, 113 S. Ct. 2786, 2795 n.7, 2798 (1993).  "This function 'inherently require[s] the trial court to conduct an exacting analysis' of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)).

This court employs a three-part inquiry to determine admissibility under Rule 702.  The trial court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a

33

fact in issue.

Frazier, 387 F.3d at 1260. Here, the district court denied admissibility of the testimony of Doctors Gelblum and Crown based on the second and third prongs of the inquiry, reliability and assistance to the trier of fact. While the Court in Daubert recognized that "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty," it held that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." 509 U.S. at 590, 113 S. Ct. at 2795. "Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Id. Further, assistance to the trier of fact is primarily a question of relevance. Id. at 591, 113 S. Ct. at 2795. Therefore, the question is whether the evidence will help the jury decide a factual dispute; "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92, 113 S. Ct. at 2796.

As discussed in reference to the IDRA, there did not exist "'good grounds,' based on what is known." Neither of the proposed expert witnesses could testify with any medical certainty to evidence with respect to Eduardo's state of mind at the relevant times that would allow a reasonable fact-finder to conclude that Eduardo was either insane at the time of the offenses or lacked the requisite mens

34

rea at the time of the offenses.[14]   Therefore, the district court's conclusion that the evidence failed both the reliability and assistance to the trier of fact prongs was not an abuse of discretion.[15]

2. Competency to stand trial

Eduardo did not argue that he was incompetent to stand trial until November 2005, almost two years after his indictment.  At that time, the defense submitted a motion for a hearing to determine competency in response to a letter the Government had provided from neurologist Ranjan Duara, M.D., that suggested Eduardo's cognitive function might be compromised to the extent that he was mentally incapacitated.  Previously, Eduardo's treating physician, Dr. Jeffrey Gelblum, had opined that Eduardo was competent, although he had noted that his condition was progressively declining.  After Dr. Duara's letter, Dr. Gelblum re-examined Eduardo and submitted a new report opining that Eduardo was not competent.

The court first heard testimony about Eduardo's competency on November

---

[14]     The district court also properly rejected, on the basis of Daubert, Eduardo's third rationale for admitting the expert witness testimony about his mental state – to show that he was easily influenced by his employees – because of the experts' inability to testify with any medical certainty about his mental state during the relevant time period.

[15]     In light of our decision that the district court did not abuse its discretion in excluding the testimony of the two doctors on the basis of the IDRA and Rule 702, we need not address the district court's alternative ground, Fed. R. Evid. 403.

23, 2005. At that time, the Government sought a 30-day, in-house competency assessment by Dr. Robert Denney. Dr. Denney testified that, contrary to defense arguments, the stay would not be detrimental to Eduardo's mental health but would, in fact, give a more comprehensive assessment of his abilities and deficits. Two other Government witnesses testified at that time about Eduardo's competency. Dr. Michele Quiroga, a neuropsychologist, testified about the tests she administered to Eduardo, her interviews with him and his wife, and her diagnosis. As a result of her examination, Dr. Quiroga determined Eduardo to be competent, not suffering from severe mental disease or defect, and to be able to appreciate the nature and quality of his acts. She further stated that although he did appear to have cognitive deficits, she also detected lack of effort and malingering. Dr. David Fishbain, a psychiatrist, evaluated Eduardo by administering a mental status exam and interviewing him and his wife. Further, Dr. Fishbain reviewed Eduardo's business correspondence and notes ranging from 1996 to 2003, witness statements about Eduardo's abilities during the same period, his medical records, and Dr. Quiroga's evaluation. He testified that he believed that Eduardo was competent, with his judgment and insight within normal limits, although he did suffer from mild cognitive impairment. Additionally, Dr. Fishbain opined that although Eduardo might have some difficulty disclosing pertinent

36

facts, it was a mild defect in that respect. After hearing from the experts, the district court agreed to the in-house assessment, and Eduardo was sent to the United States Medical Center for Federal Prisoners in Springfield, Missouri.

At the end of February 2006, the court held a four-day competency hearing beginning with Dr. Denney, who had conducted the month-long assessment. Dr. Denney testified that although he thought that Eduardo had some damage to his brain, he thought that Eduardo was malingering. This finding comported with the assessment of another witness, Dr. Quiroga. Dr. Denney administered 26 psychological tests over a nine-day period, including six that were designed to detect malingering; Eduardo tested positive for poor effort on five of those tests. As a result, Dr. Denney did not believe that the remaining neurological test results were valid indicators of Eduardo's true neuropsychological functioning. Ultimately, Dr. Denney posited that Eduardo's current neuropathology did not support a diagnosis of dementia, and neither did the functional imaging results (SPECT and PET scans). Furthermore, the test results did not comport with the conversations Dr. Denney had with Eduardo during interviews and casual conversation. Finally, Dr. Denney compared Eduardo's test scores to those from prior administrations and noted significant departures that were not logically or reasonably consistent; in some cases Eduardo actually improved, which would not

be the case if he had progressive dementia.

Dr. Gelblum testified that he still believed that Eduardo basically understood the charges against him but that he was not able to assist his attorneys in preparing his defense and thus was not competent to stand trial. Further, the damage revealed in the scans of Eduardo's brain was tied to Eduardo's ritualistic behaviors and impaired his executive planning ability, memory search retrieval, and performance on verbal manual tests. Another defense expert, Dr. Joseph Sesta, a forensic neuropsychologist and clinical pharmacologist, testified that his review of the tests Dr. Denney performed did not suggest that Eduardo was malingering. Instead, he thought the results seemed compatible with a true neuropathology, as reflected in Eduardo's neuroimaging studies.

Although the court ruled orally that the Government had shown that Eduardo was competent, it ordered another round of testing "in an abundance of caution." The court then appointed Dr. Charles Golden to evaluate Eduardo for competency. Dr. Golden performed his evaluation of Eduardo without seeing any of the other experts' reports and concluded that Eduardo was not competent to stand trial. Dr. Golden stated in his report that Eduardo was incapable of distinguishing between accurate and inaccurate memories. Before the renewed competency hearing, Dr. Golden was given all of the other experts' reports to

38

review.  At the renewed hearing, which took place during the trial, Dr. Golden testified that injuries to Eduardo's anterior left hemisphere meant that he could no longer effectively retrieve memories and that he had holes in his memory that he attempted to fill with erroneous information.  He explained Eduardo's test results, where he scored in the low-normal range, by noting that Eduardo's deficits did not affect his intelligence or ability to function on a day-to-day basis.  He further testified that Eduardo's working memory was intact but his intermediate memory was disturbed and that although his long-term memory was there, he was not able to extract information in an organized manner.  Like Dr. Denney, Dr. Golden did not think that Eduardo had dementia or primary memory deficit.  But Dr. Golden thought that Dr. Denney was too quick to conclude that Eduardo was malingering; he thought that was especially true because he had seen the same pattern of test scores in other individuals with the same type of brain injury.  Dr. Golden explained that Eduardo's problems were with processing large amounts of information and organizing it.  As a result, he would not be capable of assisting his counsel when presented with documents.

After the hearing, the district court again found Eduardo competent.  Almost a year later, at the initial sentencing, the court denied without prejudice his motion to be declared incompetent but entertained a supplemental motion.  On August 13,

2007, the court issued a comprehensive order, explaining its decision that Eduardo was competent.

We review the district court's finding that the defendant is competent to stand trial for clear error. United States v. Izquierdo, 448 F.3d 1269, 1276 (11th Cir. 2006). A district court's findings of fact are clearly erroneous "only when we are left with a definite and firm conviction that a mistake has been committed." Id. at 1278 (quotation omitted). Additionally, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. (citation omitted).

A defendant is mentally incompetent to stand trial when he is "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). In order to be considered competent for trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and he must have a "rational as well as factual understanding of the proceedings against him." United States v. Cruz, 805 F.2d 1464, 1479 (11th Cir. 1986) (quotation omitted). Here, Eduardo challenges only the first prong of the test, i.e. the ability to consult with his attorney. While the experts may provide evidence

about the defendant's state of mind and abilities, the ultimate decision about competency lies with the district court. United States v. Makris, 535 F.2d 899, 907 (5th Cir. 1976).[16]

We begin initially by observing that the district court sought many opinions and held extensive hearings on this issue. After hearing testimony from both defense and government experts, the court had Eduardo sent to a facility to be tested and observed for a month. Then, after that evaluation and more testimony from more experts, the court appointed Dr. Golden to assess Eduardo's competency. Four psychologists administered psychological tests to Eduardo and a fifth reviewed the others' tests and gave his opinion; Eduardo's MRIs and scans were evaluated by at least five neurologists. All of these experts gave different opinions about the severity and the cause of the damage in Eduardo's brain. The neurologists disagreed about whether his EEGs were abnormal and what caused the cavitated area of his brain. Some of the psychologists attributed his test scores to malingering while others looked at the same scores and determined that they represented a precise injury to a specific part of the brain.

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Thus the district court was left to evaluate several expert opinions of the nature and severity of Eduardo's condition. The court determined that Dr. Denney's opinion was more reliable because of his experience conducting competency evaluations, his impressive credentials, and his ability to evaluate Eduardo over a long period of time. See Izquierdo, 448 F.3d at 1279 (approving district court's reliance on psychiatrist's opinion when that expert had examined the defendant over a longer period than the other expert). It also noted that Dr. Denney's finding of malingering was corroborated by Dr. Quiroga's similar finding.

We cannot conclude that the district court's finding was clearly erroneous. Dr. Denney had conducted, at the time of the competency hearing, over 500 competency evaluations and he had found defendants incompetent approximately 23% of the time. We note that Dr. Denney's evaluation, taking place as it did over a month in a resident facility, permitted him to observe Eduardo throughout the day and consistently, something the other experts did not have the ability to do. Dr. Denney based his ultimate determination that Eduardo was competent and was malingering not just on interviews with Eduardo and his wife in conjunction with psychological testing but also on those daily observations (and those of other staff members), reading the reports of the experts who testified in the Daubert hearings,

42

and review of the neurologists' reports. The testing revealed unusual patterns that suggested to Dr. Denney, who has published in the field, that Eduardo was malingering, while the interviews revealed that Eduardo understood a great deal about his prior business dealings. The daily observations are particularly significant. Eduardo revealed several times in conversation that his memory was more intact than an incompetent person's would be. For instance, he remembered the intake nurse's name several days after that brief meeting and where Dr. Denney had vacationed almost two weeks after it occurred. However, at the same time, Eduardo claimed not to know his address, birth date or clothing size, facts that dementia patients typically lose last. This type of observation of the whole person was not available to the other evaluating psychologists. In sum, Dr. Denney's evaluation was far more comprehensive and extensive than any of the other experts' and the district court did not err in crediting it.

The district court also had, by the time of the second competency hearing, observed Eduardo at trial and his interactions with his attorneys. Although Eduardo's attorney testified that Eduardo was incompetent, the court noted that the same attorney had earlier argued Eduardo was competent and only changed his assessment after Dr. Duara's email. Such an abrupt reversal understandably undermines the attorney's persuasiveness on this issue.

In conclusion, we hold that the district court did not commit clear error when it determined that Eduardo was competent to stand trial. The court thoroughly evaluated the evidence, listened to the experts' opinions, and provided persuasive reasoning for crediting Dr. Denney's opinion.

## III. CONCLUSION

We affirm Eduardo's, Hector's, and Puerto's convictions. We also affirm Puerto's and Hector's sentences.[17]

AFFIRMED.

---

[17] The district judge is to be commended for his superb handling of this case, especially his careful consideration of the mental health issues.